# CHARLESTON.

## BUTCHER *v.* WEST VIRGINIA & P. R. CO.

Submitted June 10, 1892.—Decided December 3, 1892.

1. RAILROAD COMPANIES—DAMAGES—BURDEN OF PROOF—NEGLIGENCE.

In an action of trespass against a railroad company for injuries received at a railroad crossing by reason of the failure of the defendant to give the signal required by statute, in order that the plaintiff should recover, he must not only prove that the defendant failed to give the signal required by statute, but also that such failure was the proximate cause of his injury.

2. RAILROAD COMPANIES — DAMAGES— NEGLIGENCE — BURDEN OF PROOF—CONTRIBUTORY NEGLIGENCE.

Where negligence is the ground of the action it rests upon the plaintiff to trace the fault for his injury to the defendant, and for this purpose he must show the circumstances under which the injury occurred, and if, from these circumstances so proven by the plaintiff, it appears that the fault was mutual, or, in other words, that contributory negligence is fairly imputable to him, he has, by proving the circumstances, disproved his right to recover, and on the plaintiff's evidence alone the jury should find for the defendant.

3. RAILROAD COMPANIES—DAMAGES — NEGLIGENCE — BURDEN OF PROOF—CONTRIBUTORY NEGLIGENCE.

A traveller on a public road must exercise at least ordinary care and caution. No recovery can be had by the plaintiff where his negligence in any degree contributed to the injury received by colliding with a railroad train at a public crossing, unless the defendant, being aware of the plaintiff's danger, and having the opportunity to avert it, fails to use ordinary caution to do so.

*J. Brannon & W. W. Brannon* for plaintiff in error:

I.—*Burden of proof as to signal.*—13 Ill. App. 535.

II.—*Duties of traveller and railway company at crossings generally.*—12 S. E. R. 532; 15 Am. St. Rep. 733 & note, p. 739; 11 Am. St. Rep. 486; 44 Am. & Eng. R. Cases 570; 8 Am. St. Rep. 809; 4 Am. & Eng. Ency. L. 70, 913; Deer. Neg. 252; 2 Beach Railways, 970; Patt. Ry. Ac. § 173 *et seq.;* 3 Law. R. R. & Pr. § 1189; 2 Wood's R. L. 1301–1332.

III.—*Proximate cause of injury.*—12 S. E. R. 532; 4 Am. &
Eng. Ency. L. 70, 914, 921, note 7; Digest Vols. 1–35,
Am. & Eng. R. Cases, p. 246, §§ 420–423; Patt. R. Ac.
§ 179; Deer. Neg. § 252; 3 Law. R. R. & P. § 1183.

IV.—*Railway company not liable for injuries resulting from
fright of horses.*—Patt. R. Ac. 152 & cases cited in note
4; Deer. Neg. 252 & note 1; 3 Law. R. R. & P. § 1176;
2 Wood R. L. 1332.

*G. M. Chidester* and *W. B. McGary*, for defendant in er-
ror cited 17 W. Va. 191, Syl. 6, 7; 18 W. Va. 579 Syl. 4, 5,
pp. 584–5; 19 W. Va. 325, Syl. 14; 27 W. Va. 146, Syl. 7,
8, 9; 16 W. Va. 307; 30 W. Va. 228, 238, 239, 241; 34 W.
Va. 538, 545, 546; 13 S. E. Rep. 1104, § 43; Am. & Eng.
R. R. Cases, Dig. Vols. 1–35, p. 243, §§ 374, 376 and 377; Patt.
R'y Ac. §§ 55, 148, 150, 159, 161, 164, 171, 175; Am. Dig. (An-
nual 1891) 3803, § 413; 2 Beach R. p. 970, §§ 970, 1009; Pierce
R. 348; Beach R'y Dig. §§ 31, 43, 59, 61, 68; 51 Am. Rep.
761; 19 Wis. 497; Shear & Redf. Neg. § 11; 1 Redf. R'y
(5th Ed.) 570 and note; 41 Am. Rep. 355; 34 Am. Rep. 690;
15 Am. Rep. 633; 4 Am. Rep. 274; 95 U. S. Rep. 161; 96
U. S. Rep. 164; 4 Am. & Eng. Ency. L. 74, 76 and note; 45
Am. & Eng. R. R. Cas. 58; 45 Am. & Eng. R. R. Cas. 191.

ENGLISH, JUDGE:

This was an action of trespass on the case, brought by
Wm. T. Butcher against the West Virginia & Pittsburgh
Railroad Company in the Circuit Court of Lewis county to
recover damages for an injury occasioned by a train of cars
belonging to the defendant running against a wagon and
team of three horses at "Dodson's Crossing" on the line of
defendant's road between the village of Jane Lew and
town of Weston in said county. The plaintiff, at the time
of the collision, was riding in the wagon, and a boy was
riding the saddle horse in the team. The declaration con-
tains the usual allegations, and the damages are laid at two
thousand dollars.

As the regular judge of the Circuit Court could not pre-
side at the trial, JOHN J. DAVIS, was elected special judge,
and presided at the trial.

The plea of not guilty was interposed, issue was joined thereon, and the case was submitted to a jury, who, having heard the evidence and arguments of counsel, found for the plaintiff, and assessed his damage at two thousand dollars; and thereupon the defendant by its attorney moved the court to set aside said verdict and grant it a new trial, upon the ground that the same was contrary to the law and the evidence in the cause, which motion was overruled, and judgment was rendered upon said verdict, to which opinion of the court in overruling said motion the defendant by its counsel excepted and tendered a bill of exceptions, in which the entire evidence introduced by the plaintiff and the defendant is set forth.

The material facts disclosed by the evidence introduced by the plaintiff are that on the 23d day of May, 1890, the plaintiff was passing along the turnpike road leading from the village of Jane Lew to the town of Weston in a wagon drawn by three horses; that when plaintiff and his team, which was driven by a boy riding one of the horses, was about two hundred yards from the Dodson crossing, where the railroad crosses said turnpike, the train came up behind him, and scared his horses, and they ran off. At this point, and from there to the said crossing, the turnpike and railroad ran parallel, and were very close together, and at said crossing said team and the railroad train collided, resulting in cutting and bruising the plaintiff, and mashing and lacerating his left hand to such an extent that it had to be amputated. The evidence shows that the train was running at the speed of sixteen miles an hour, which would be about one mile in four minutes, and it would run two hundred yards in about thirty seconds. After the horses commenced running they must have gone at about the same speed, because they met the locomotive at the crossing, or rather ran into it at that point, although they may have had a little the start of the train.

Was the injury complained of caused by the failure of the trainmen to give the statutory signal by blowing the whistle or ringing the bell? Can we say, that, if the whistle had been blown for Dodson's crossing at a point three hundred and thirty yards therefrom, as required by statute

the injury would not have occurred? The plaintiff, when asked, "Where was the train when the team started to run off? How far was it from Dodson's crossing?" answered, "I should say two hundred yards, and that when the horses started to run off they were about two hundred yards from Dodson's crossing;" so according to his own statement, the train must have been about opposite to his wagon when they started to run. And he further states that the train came up behind him, and scared his horses, and they ran off; and when asked: How it was that he knew the train was coming. "You say the horses were scared, and there was nothing there to obstruct your view, and the train was running close to the county road?" answered, "The noise of the train behind me scared the horses;" and when asked, "Well, William, were you drinking any that day?" answered, "Yes, sir;" and when asked, "Can you account for them—how many?" answered, "I know I did not take more than two, and I ain't positive I took two." He further states that Ralph Butcher, a boy seventeen or eigh-- teen years of age, was driving the team, riding the saddle horse, and he (plaintiff) was sitting in the wagon on the seat board, and that the accident occurred immediately on the crossing.

We next look to the condition of Ralph Butcher, the driver, and find that Green Waggoner, a witness for the defence, in regard to whose testimony there is no conflict, says that on the 23rd of May he went up the road behind plaintiff as far as Van Flesher's; that there was a young fellow with Butcher; Butcher was on the wagon, and looked like he was drunk; both of them seemed to be tottering along; and when asked to explain to the jury what he meant, answered, "He looked to me like he was drunk;" and when asked, "How was the other fellow?" answered, "He was drunk, too," and when asked if he was tottering too, answered, "It looked that way."

Harrison Alkire another witness for the defence, states that he saw them about a quarter of a mile from Dodson's crossing, at Eddy's blacksmith shop. That when Butcher and this young man came up to the shop they ran against the fence, and one of the horses got fastened in the fence.

The fore horse got down close to the fence, and got his trace fastened. The young man got off the horse to fix the trace and fell down in the road. "I would call them drunk. I helped him after he got off his horse, and then he and Mr. Butcher went about their business." That the road was wide enough for two wagons to pass where the horse got fastened. Mr. Eddy, the blacksmith, after speaking of the team running against his fence, states that "Mr. Butcher, after some time, got off of the wagon, and came into the shop, and from his talk and conversation I judged him to be drunk. He could hardly stand up, and had to hold to the side of the shop. The young man was on the saddle horse. He got off of the horse after the team ran into the fence, and he and Harrison Alkire fixed up a trace that had come unfastened, and got the team away from the fence. After that he staggered around, and fell down."

Moses Kittle, another witness for the defence, states that he saw a man and boy passing with a wagon and three horses before they reached Eddy's shop, and heard great hallooing and whooping on one or two occasions, and thought it was cattle coming up the pike; and when he went over to the rise towards Waggoner's, saw the wagon with three horses in it and two parties away up on the turnpike.

There is other evidence on this point, but this is sufficient to clearly indicate not only the condition of the driver, but the plaintiff himself, when he was approaching the crossing where the accident occurred, and was not more than one quarter of a mile therefrom. If the plaintiff was sober himself, which is more than problematical—he had intrusted the management of his team and wagon in which he was travelling to a young man, who, if he was himself capable of exercising any degree of care or prudent forethought, he must have seen and known was incapable of driving a team with any degree of safety, and who had already shown himself incapable of keeping the horses in the turnpike road.

Under this statement of the case, are we warranted in saying that the failure of the trainmen to give the statu-

tory signals for Dodson's crossing constituted the proximate cause of the injury received by the plaintiff? On the contrary, it is very clear that, if the team had traveled at its ordinary gait, it never would have reached the Dodson crossing at the time the train did from the point where the team started to run off. Instead of going at the speed of three or four miles an hour, it must have gone at the rate of sixteen miles an hour. The plaintiff saw the train, and had notice of its approach towards the Dodson crossing, when he was two hundred yards away from said crossing; and, but for the fact that his driver was unable to control the team, no accident would have resulted.

The plaintiff knew the train was approaching, because, when asked if the train whistled at the Courtright crossing, he answered, "Yes, sir; I think they did;" and Woodell, the engineer who was in charge of the train, says he blew the whistle both at Courtright's and for Dodson's crossing, the last whistle being sounded just a little on this side of Courtright's house, at the whistling post for Dodson's crossing; and, when asked how far it was from Courtright's crossing to Dodson's crossing, replied, "three hundred yards, or something like it." This, then, would be a point within the sixty rods required by statute for whistling before a crossing is reached. Woodell swears positively that he did blow the whistle for Dodson's crossing. In this statement he is corroborated by the witnesses Morgan, W. H. Jeffries, and P. T. Lorentz. One or two witnesses say the whistle was not blown for Dodson's crossing, and others say they did not hear it.

On this point, Lawson, in his work on Rights and Remedies (volume 3, § 1184) says: "Where the evidence is conflicting as to whether the bell was rung or the whistle sounded at a crossing, and there is affirmative testimony that this duty was performed and negative testimony by other witnesses that they did not hear it, the affirmative evidence of the fact should overcome the negative. That the plaintiff did not hear the signal is no evidence that it was not given."

But, for the purposes of this case, I regard it as immaterial whether the whistle was blown for Dodson's crossing

or not, as all the benefit it would have been to the plaintiff would have been to give him warning of the approach of the train to the crossing, and on this point a witness, T. G. Walker, introduced by the plaintiff, states that a man driving along the road sitting on the wagon seat could see the train after it left Jane Lew. Add to this the fact that the plaintiff admits in his testimony that he thinks the train blew its whistle at the Courtright crossing, and, if it is true that from his position in the wagon the plaintiff could have seen the train from the time it left Jane Lew, and heard it whistling at Courtright's crossing, and again heard it coming behind him, he must have known it was approaching the Dodson crossing, and he had all the warning he could have had, if it had blown for the Dodson crossing. The failure to give the statutory signal, then, was not the proximate cause of the defendant's injury.

If I am correct in this conclusion, and it is made to appear that the injury received by the plaintiff was caused by his own negligence, the finding of the jury was erroneous, and the court below erred in refusing to set it aside, because by the language of the statute (section 61 of chapter 54 of the Code) which requires such signal to be given, it is provided that "the corporation owning or operating the railroad shall be liable to any party injured for all damages sustained by reason of such neglect;" and it follows that the corporation should not be liable for damage occasioned by the neglect of the plaintiff himself.

If it appeared in this case that the plaintiff was in the act of crossing the railroad at Dodson's crossing after looking and listening as the law requires, and that by reason of the failure of the trainmen to give the statutory signal he had no notice of the approach of the train, and, in consequence thereof, his injuries were inflicted, the verdict and judgment complained of might be sustained; but when we can in no manner trace the result to the failure to give such signal, I can not perceive how said verdict and judgment can be sustained.

The injury to the plaintiff in this case evidently resulted from the fact that the horses attached to his wagon became frightened at the train, and from the further fact that at

the time they became so frightened and ran away the plaintiff himself was under the influence of liquor, and the party to whom he had intrusted the management of his team was drunk, and incapable of controlling or managing the horses.

Patterson on Railway Accident Law, page 152, says: "But the railway is not liable for injuries resulting from the fright of horses on a highway, caused by the mere sight of the train, or by the noises necessarily incident to its movement."

This law is reasonable, and, were it not the law, it would be impossible to operate a railroad where it is paralleled by turnpikes and country roads, as was the case in this instance. In the case under consideration there was nothing to obscure the approaching train. The testimony shows that it was visible from the time it left Jane Lew; that it blew its whistle at Courtright's crossing, so that the party in charge of the team, if he had been in condition to do so, could have dismounted and unhitched or held his team if he had wished to do so.

In the case of *Railroad Co.* v. *Stinger*, 78 Pa. St. it was held in points 5, 6, 7 and 10 of the syllabus:

"5. A railroad company having a chartered right to propel their cars by steam are not responsible for injuries resulting from the proper use of such agency."

"6. Whether alarming a horse or causing an accident by a rapidly moving train, or sounding a whistle, will make the company liable for damages, depends upon whether it was from want of proper care in those in charge of the train."

"7. What would be due care in running a train through a sparsely settled rural district might be negligence in approaching a large city."

"10. One driving an unbroken or vicious horse, or one easily frightened by a locomotive, along a public road running side by side with a railroad, does so at his own peril; the right of the company to move their trains on their road is as high as that of the individual to use the public road."

In the case of *Flint* v. *Railroad Co.*, 110 Mass. 222, in an action to recover for injuries caused by the plaintiff's horse

becoming frightened by cars on the defendant's railroad, it appeared that the railroad crossed the highway on which the plaintiff was traveling; that the horse became frightened when about five rods from the crossing by the approach of two cars about ten rods therefrom; that the cars were coming on a down grade by force of gravitation at the rate of eight or ten miles an hour; and that no signal was given of their approach. Held, that these facts would not warrant the jury in returning a verdict for the plaintiff.

Now, as to the horses attached to the plaintiff's wagon on the day he was injured, our only way of determining whether they were afraid of the cars, and liable to run off when the train approached them, is by the fact stated by the witnesses that they did run off; and the plaintiff himself says, "The train came up below, and frightened my team, and they ran away."

There is nothing in the evidence that discloses that the defendant was running its train at an unusual rate of speed; in fact it appears that it was only running at the rate of sixteen miles an hour. It does not appear that any unusual or unnecessary noise was being created by escaping steam, or by blowing the whistle, but the horses were frightened at the ordinary noise made by a train in motion; and we must conclude that the plaintiff was driving horses that were unbroken, or those that were easily frightened by a locomotive, and, such being the case, the circumstances would be similar in point of fact to the case of *Railroad Co.* v. *Stinger*, above quoted.

It would be grossly unreasonable to require the conductor of a railroad train to check its speed or stop its progress every time a team of horses on a lateral road showed a disposition to frighten or run away, and the conductor who pursued that course in these days of rush and rapid transit would receive a very small share of the patronage of the travelling community.

As to the manner in which this accident occurred there is no conflict between the plaintiff and the engineer, Woodell. The latter says he was standing in the cab, on the right side, looking out—the only place he could stand—

when he heard something strike the cab, and chains rattling, and then whistled down brakes, and looked out, and saw the lead horse up against the cab, the wagon and two men. That was the first knowledge he had of the approach of the wagon. That Butcher was not hurt until after down brakes was whistled, for just after the horse struck the cab he looked back, and saw Butcher sitting in the wagon. They were on this side of the crossing, in the cut, when they ran against the train in the cut. The wagon upset against the train, and threw plaintiff out between the railroad and the side of the hill.

Butcher, in his testimony, says: "There was a little embankment there, and the horses went in between that and the train. The wagon turned over and was broken to pieces." And, when asked what part of the train struck him, replied that he did not know for certain what part of the train; some of the coaches, he thought. So that it appears from the evidence that the plaintiff's team was not run over by the train at the crossing, but that the team, in its fright, running away, struck the cab, which, as is well known, and as is shown by the evidence, is back of the engine; and the plaintiff was injured by his wagon upsetting and throwing him against one of the coaches. The injury to the plaintiff, then, was not occasioned by the train running against the team, but by the team, in its fright, running against the side of the train. My conclusion, then, is that the fright of the team was the proximate cause of the injury.

Shearman & Redfield on Negligence (volume 2, § 463) states the law as follows: "The rights of a traveller on the highway, at a point where it is crossed on a level by a railroad, are subordinate to those of the railroad company, so far as to require the traveller to give way to any train which is in sight or hearing, though not in such a sense as to give the company a right to block up the highway; for its right is only given for the purpose of travel, not of storing cars or goods. Both parties are, however, equally bound to use ordinary care—that is, such care as a prudent man would usually take under similar circumstances—the one to avoid committing, and the other to avoid receiving, injury."

In this instance the engineer was at his post on the right hand side of the cab, his attention directed to the crossing, which was apparently clear, while the runaway team was on the left side of the train, advancing rapidly in the same direction the train was going, but did not reach the crossing until the head of the train had passed, and in consequence the lead horse struck the cab back of the engine, which gave the engineer the first intimation of the presence of the horses and wagon. The train was where it had a right to be, and the frightened horses, by running against it, caused the plaintiff's injury. The fright of the horses was occasioned by the appearance of the moving train, without any unusual noise or emission of steam, so far as appears from the evidence.

In the case of *Beyel* v. *Railroad Co.*, 34 W. Va. 538 (12 S. E. Rep. 532) this Court held that "the traveller and the company have mutual and reciprocal duties and obligations in such case" (that was where the traveller was crossing the railroad at a regular crossing) "and, though a train has the right of way, the same degree of care and diligence to avoid collision is due from both."

Lawson on Rights, Remedies and Practice (volume 3, § 1183) states the law as follows: "Where, by statute or municipal ordinance, the railroad is required on approaching a crossing to ring a bell or sound a whistle, the omission to do so is negligence rendering the company liable, provided the failure of duty is the proximate cause of the injury, and they are not able to show that the omission was reasonable and prudent."

Shearman & Redfield on Negligence (volume 1, § 25) under the heading "Proximate Cause," says : "We now come to the most important and difficult part of the general definition of a right of action upon negligence—the connection between the negligent act or omission and the damage. No action can be maintained upon an act of negligence unless the breach of duty has been the cause of the damage.

The fact that the defendant has been guilty of negligence followed by an accident does not make him liable for the resulting injury unless that was occasioned by the negligence. The connection of cause and effect must be estab-

lished ; and the defendant's breach of duty, and not mere-
ly his act, must be the cause of the plaintiff's damage."

In section 26 the same author says : "Breach of duty
must be the proximate cause. The breach of duty upon
which an action is brought must be not only the cause, but the
proximate cause, of the damage to the plaintiff. * * *
The proximate cause of an event must be understood to be
that which, in a natural and continuous sequence, unbroken
by any new cause, produces that event, and without which
that event would not have occurred. * * * That is the
proximate cause which is most proximate in the order of
responsible causation."

"If it can not be said that the result would have inevita-
bly occurred by reason of the defendant's negligence, it
can not be found that it did so occur, and plaintiff has not
made out his case." See Bigelow, Torts, 608–626.

Now, the question is, did the failure to whistle for Dod-
son's crossing, if such failure was clearly proven, have any-
thing whatever to do with frightening the plaintiff's horses?
What witness in the case testifies that such failure, if it ex-
isted, had any effect whatever in causing the plaintiff's in-
jury ? If the horses were frightened at the train, and the
evidence is that they were two hundred yards from the
crossing, can any one say that a whistle sounded near them
would have had a tendency to quiet them and allay their
fears ? Surely not. It is, however, too evident that this
injury was not caused by any negligence on the part of the
defendant. The injury resulted from the fact that the
plaintiff went onto this turnpike road, which he knew ran
parallel with and very near to the railroad track, and in so
doing he intrusted his team to a driver who, by reason of
his intoxication, was incapable of controlling it. The
horses became frightened at the train passing along with-
out unusual noise. The fright of the horses was the prox-
imate cause of the injury, and not the failure to give the
statutory signal. By going onto this road with a team that
was afraid of the cars, with a drunken driver, he was guilty
of contributory negligence.

In the case of *Phillips* v. *County Court*, 31 W. Va. 478
(7 S. E. Rep. 427) this Court held that a traveler on a pub-

lic road must exercise at least ordinary care and caution. No recovery can be had by the plaintiff in an action against a county where his negligence in any degree contributed to the injury, unless the defendant, being aware of the plaintiff's danger, and having the opportunity to avert it, fails to use ordinary caution to do so.

In the case of *Gerity's Adm'r* v. *Haley*, 29 W. Va. 98 (11 S. E. Rep. 901) this Court held : "Where negligence is the ground of the action, it rests upon the plaintiff to trace the fault of his injury to the defendant, and for this purpose he must show the circumstances under which the injury occurred; and if, from these circumstances, so proven by the plaintiff, it appears that the fault was mutual, or, in other words, that contributory negligence is fairly imputable to him, he has, by proving the circumstances, disproved his right to recover, and on the plaintiff's evidence alone the jury should find for the defendant."

Judge GREEN, in his opinion, quoted this law from Judge Cooley's work on Torts (page 673) and, in commenting on it, says : "This, it seems to me, is a correct exposition of the law, and consists with our decisions, though there are to be found in them expressions which, unless the whole case is examined with care, might seem to be inconsistent with the law as above stated ;" and this quotation was incorporated in the syllabus.

Numerous other cases might be cited bearing upon the questions involved in this case, but these are regarded as sufficient to show that the plaintiff was not entitled to recover anything from the defendant under the facts disclosed by the testimony; and for these reasons the judgment complained of must be reversed, the verdict set aside, and the case remanded to the Circuit Court of Lewis county for further proceedings to be had therein, and the defendant in error must pay the costs of this writ of error.

REVERSED. REMANDED.