Marie R. Boyce, *Admx., etc. v.* George Black

(No. 9134)

Submitted April 8, 1941. Decided April 22, 1941.

*Max DeBerry*, for plaintiff in error.

*S. A. Powell* and *Dewey S. Wass*, for defendant in error.

RILEY, JUDGE:

Marie R. Boyce, administratrix of the estate of Vernon Boyce, deceased, plaintiff in this action brought against the defendant, George Black, to recover damages for the alleged wrongful death of her decedent, prosecutes error to a judgment of the Circuit Court of Ritchie County in defendant's favor, based upon a verdict directed at the close of plaintiff's evidence in chief.

The declaration alleges that the defendant negligently operated his automobile, in which decedent was a passenger, on Route No. 50 between the City of Pennsboro and the Town of Ellenboro, and that by reason of defendant's alleged negligence, decedent was fatally injured.

Three issues are raised in plaintiff's brief: (1) whether the evidence was sufficient to establish primary negligence of defendant contributing to decedent's injuries;

(2) whether the evidence showed that decedent assumed the risk by riding in the defendant's automobile without making any protest against the alleged negligent operation thereof; and (3) whether the court erred on a motion to set aside the verdict in requiring plaintiff to file a writing setting forth in detail claimed misconduct during the trial and the names of the witnesses to be presented before the court would hear evidence of such misconduct.

In the statement of facts and inferences upon which we base this opinion, we, of course, are guided by the rule announced in *Fielder* v. *Service Cab Co.,* 122 W. Va. 522, 11 S. E. (2d) 115, and *Hambrick* v. *Spaulding,* 116 W. Va. 235, 179 S. E. 807, to the effect that before directing a verdict in a defendant's favor "every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence."

On the night of the accident defendant, accompanied by six other young people including decedent, drove his car over Route No. 50 from a dance hall near Ellenboro to Pennsboro. On the return trip, over the same route, two of the passengers occupied the front seat with the driver, Black, and decedent, together with three passengers, the rear seat, decedent being on the extreme right with a girl passenger on his lap.

The fatality occurred when defendant's automobile (then being driven in a westerly direction) left the concrete pavement at a left curve (about half-way between Pennsboro and Ellenboro) and struck a telephone pole. The curve was just west of what is designated in the record as a "bridge" over Husher's Run. A road (not described) joins with Route No. 50 from the north at the curve. The pole was located nine and a half feet north of the paved portion of Route No. 50, and approximately one hundred and thirty-five feet west of the sharpest part of the curve. There was a concrete culvert forty feet east of the telephone pole. The north headwall of the culvert was some distance from the paved portion of the highway

and flush with the north berm. This berm was estimated to be more than three feet in width and north of it was a ditch which drained both ways into a ditch leading into the culvert. The telephone pole was about ten inches in diameter, being split vertically for about ten feet.

As the automobile approached the "bridge," defendant saw the head lights of two automobiles approaching from the opposite direction. At or about the sharpest point of the curve the right wheels of defendant's automobile left the concrete pavement. The car proceeded with its right wheels over or along the outer edge of the culvert headwall and across the ditch which connected with the culvert until it came to a stop a short distance beyond the pole which it had struck. According to defendant's written statement, the front end of the car did not strike the pole, but "the rear part failed to track out of the ditch, and consequently, struck the pole. The right rear door was caved in, the right rear fender smashed, and a dent made in the top at the top of the door. When the car stopped, the rear end was from six or eight feet from the pole, and the front end was extending up on the paved portion of the road." What happened to decedent as the pole was struck is not clear from the evidence; but defendant states he first noticed him lying on the edge of the paved portion of the road "to the right of and somewhat in front of the car as it was stopped, about twenty feet from the pole."

The evidence indicates that the right side of the car struck the pole with a great force. W. C. Taylor, the sheriff of Ritchie County, who investigated the scene of the accident, testified that he could distinguish between the old break and the new break in the pole; that the pole was completely severed at a point above the old break, and a large chunk, approximately seven feet long, was knocked out; and that the pole was left suspended from the wires overhead. Trooper Swiger testified that the top of the automobile "was mashed in considerably; the door was bowed and looked like it had been whipped around some object; the running board was mashed in;

the rear fender was mashed, and the whole car looked like it was sprung some."

Witnesses testified variously as to the speed at which the automobile was being driven. Gerald Sandy, a passenger, estimated the speed at thirty-five to forty miles an hour as it approached and a speed of forty to forty-five miles an hour as it rounded the curve. Jane Carter, another passenger, seated in the rear on the left side immediately behind the driver, estimated the speed at fifty miles an hour, and the defendant's written statement gave an estimated speed of forty to forty-five miles an hour. How fast defendant was driving, however, does not depend alone upon the conflicting estimates contained in the testimony of witnesses and defendant's statement. Looming most important in this case and bearing directly on the question of speed are the physical facts, considered with the movements of the automobile from the time it came into the curve until it reached a stop after striking the pole.

The record does not show conclusively what speed limit prevailed at the place of the accident. The "bridge" is so meagerly described in the record that it is impossible to determine, as a matter of law or fact, whether it comes within Code, 17-8-12, which, among other things, provides for a fifteen mile speed limit for every motor vehicle or motorcycle, traversing a public highway crossing, or bridge, or sharp turn, or sharp curve, or steep descent, or school zone. Whether the curve is a "sharp curve" within the meaning of the statute, we cannot say as a matter of law, because the record is silent on the presence or absence of a sign or marker provided by Code, 17-8-12. However, in addition to the testimony of witnesses designating the curve as "sharp," defendant so admitted in his statement, to which we have already referred. Under the circumstances, the jury would have been justified in finding that defendant in the operation of his automobile was governed by the fifteen mile speed limit prescribed by the statute. Of course, under the statute the burden is on the plaintiff to establish by a clear preponderance of

the evidence that a sharp turn or curve existed before a violation of the statute can be shown for the purpose of establishing civil liability. See *State* v. *Corley,* 116 W. Va. 630, 182 S. E. 794, 796, as to the rule in criminal cases. Plaintiff's counsel also rely upon the existence of the road joining Route No. 50 from the north as establishing a fifteen mile speed limit. The character of this road is not sufficiently shown by the record to establish a public highway crossing as contemplated by the statute.

The question whether a fifteen mile speed limit prevailed at the place of the accident, however, is unnecessary to the decision here. It is apparent from the record that the tracks appearing on the ground immediately after the accident would justify a jury finding to the effect that defendant was driving his automobile at such a dangerous and reckless rate of speed that it was caused to leave the concrete road a distance of about one hundred and thirty-five feet from the telephone pole and skidded a distance of seventy-five feet. Trooper Swiger, a member of the Department of Public Safety, testified as to the existence of these tracks. True, the record does not contain any satisfactory testimony expressly to the effect that the tracks were made by defendant's automobile. Such testimony, however, is not required to establish their identity, for the reason that they led from the edge of the concrete directly to the telephone pole, which was the only one shown by this record to have been struck and broken by defendant's automobile.

The distance which the automobile travelled after leaving the concrete pavement until it came to a stop, the great force of the impact in breaking the pole completely in two, and causing a large chunk to be knocked out, is indicative of the high rate of speed at which it was travelling. True, the pole had been partially broken before the accident, but this partial break was by no means nearly complete, and the force sufficient to complete the breaking of a ten-inch pole we think sufficient, together with the broken condition of the car as it appeared to Trooper Swiger after the accident, for a jury to find that defendant was driving his car at a dangerous and exces-

sive rate of speed. It was for the jury to say whether the accident would have occurred if the speed of the automobile had been reduced. The question of defendant's primary negligence clearly was within its province.

The defendant says that plaintiff's decedent assumed the risk of defendant's negligent operation of the automobile, because the record does not disclose that he made any protest. However, Jane Carter did protest, but in vain. Evidently the defendant laughed in response to her protest. It will not do for counsel to say that the laugh was elicited by a program on the radio, because the record is silent as to any humorous program being on the radio at the time. It was for the jury to say whether the laugh, coming immediately after the protest, was in response thereto. If it was, likewise it would have been of no avail for decedent to have protested. Where there is a duty to protest, an unheeded protest made in an audible tone of voice by one of several passengers will relieve fellow passengers from the duty to make protest.

As in *Malcolm, Admr.* v. *American Service Co.,* 118 W. Va. 637, 640, 191 S. E. 527, this Court finds it difficult to say that at the time the automobile was approaching the danger a protest "might not have been the very worst thing" that decedent could have done. As said in *Herold* v. *Clendennen,* 111 W. Va. 121, 161 S. E. 21, 22, "the extent to which one riding as a guest should anticipate an impending peril and act in relation thereto, depends upon the facts of each case, and ordinarily the question of the exercise of due care on the part of the plaintiff is for the jury, under proper instructions." Whether decedent with his view evidently obstructed by the girl sitting on his lap could have anticipated or realized the peril in time to make effective protest can only be solved under the instant circumstances by the verdict of the jury. Even if he could, his personal representative is not precluded as a matter of law from recovery for that reason. Guests in an automobile are not required to be constantly at height of attention and alertness in order to raise an instant alarm if danger should arise. *Darling* v. *Browning,* 120 W. Va. 666, 670, 200 S. E. 737.

It follows that the trial court was not justified in directing a verdict in defendant's favor and his action in so doing was reversible error.

Under this decision, the question whether the trial judge properly refused to permit, in support of plaintiff's motion to set aside the verdict, the introduction of testimony as to misconduct of the trial becomes moot. However, we feel it incumbent upon us to say that the offering of evidence reflecting upon the honesty and integrity of parties litigant, witnesses, or counsel should not be lightly made. The offer of the testimony in the instant case, though made in good faith, was a serious reflection upon the person charged with misconduct, and, incidentally, tended to reflect upon the character and integrity of defendant's counsel. Nevertheless, it was made without any substantial basis.

For the foregoing reasons, we reverse the judgment of the circuit court, set aside the verdict, and award a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*