Norman Weddle, *Admr., etc. v.* Virginian Railway
Company *et al.*

(No. 9354)

Submitted September 29, 1942. Decided November 10, 1942.

McGinnis & Mann, John R. Pendleton and W. C. Plunk-
ett, for plaintiffs in error.

Lilly & Lilly and C. R. Harless, for defendant in error.

Fox, President:

The Virginian Railway Company and H. W. Smith com-
plain of a judgment against them, rendered by the Circuit
Court of Raleigh County on December 13, 1941, in an ac-
tion for wrongful death instituted by Norman Weddle,
administrator of the estate of Lettie Weddle, deceased.
Judgment was rendered upon a jury verdict, and was in
the amount of $1134.00. A motion made in the trial court
to set aside the verdict and award defendants a new trial
was overruled.

The line of the Virginian Railway Company runs
through the village of Helen in Raleigh County. A side-
track branches off from said line and crosses a state

highway in said village, which highway is paved for a width of sixteen feet. About two o'clock in the morning of May 12, 1940, an automobile, driven by one Howard Milam, crashed into the tender of a locomotive at this crossing, which resulted in the death of plaintiff's decedent and two other occupants of the automobile. At the time of the accident, there were nine people in the automobile, five young men and four young women. Three of the men were sitting in the front seat of the automobile, and two men and the four girls in the rear seat. Lettie Weddle and Gracie Weddle, both of whom were killed, were sitting on the lap of one of the young men. Fred Smith, who was in the rear seat, suffered injuries from which he later died. This party of young people had spent the evening at and around a beer and dance parlor some miles away, and along about midnight had gone to a place called Rhodell, and were returning home when the accident occurred, and were traveling in the direction of Beckley. About 315 feet from the crossing, there is a hump in the road, but the road is straight, and there is a clear view from the crossing in the direction from which the automobile was traveling for about 315 feet. H. W. Smith, the engineer on the locomotive, and one of the defendants in this action, says that he saw the automobile being driven by Milam when it topped the hump in the road, and that his locomotive was then moving toward the crossing at a rate of about five miles an hour. He assumed that the automobile would stop before reaching the crossing, but that later, he does not state how much, he noticed that the car was not lessening its speed, which indicated that it did not intend to stop. At this time, as he testified on this trial, he was about fifty feet from the crossing, but on the former trial, it is shown that he stated that he was about sixty feet from the crossing. He also stated that when the brakes were applied, the automobile was about the same distance from the crossing as was the locomotive, but he qualifies all of his testimony by stating, in effect, that he could not be sure of distances, and his testimony on this point whenever given was an estimate. It seems to be conceded

that the automobile was traveling at the rate of approximately thirty miles an hour. Milam says that it was running from twenty-five to thirty-five miles. It is quite apparent that if the automobile was only fifty or sixty feet away from the crossing when Smith applied the brakes on the locomotive, and that the locomotive was that distance from the crossing, and the automobile was being driven at the rate of thirty miles an hour, and the locomotive running five miles an hour, the automobile would have passed the crossing before the locomotive could have reached it, and the accident would not have occurred. The automobile was driven on the right-hand side of the highway. The locomotive approached the highway from that side. The tender was struck by the automobile near the front and corner in the direction it was going, so that it seems clear that the tender of the locomotive was at or near the center of the highway when the automobile struck it. The locomotive was being run backwards, so that the rear of the tender first reached the highway. There was attached to the locomotive thirty-one loaded cars of coal. The locomotive stopped immediately after the accident, and the tender blocked the entire highway and extended beyond the paved portion of the highway some four or five feet, so that the locomotive must have moved twelve or thirteen feet after the automobile struck it. Milam, the driver of the automobile, says that he did not see the locomotive until he was right up against it, within eight or ten feet; that he only had time to lift his foot from the accelerator.

The events and testimony narrated above are not disputed. One of the disputed questions is whether the employees of the railway company exercised due care in the operation of the locomotive and the train attached thereto. These employees, an engineer, fireman and two brakemen, testify that the brakes were in good condition; that there was a light provided for the rear of the locomotive and tender; that same was burning at the time of the accident and before. They also testify that a bell, which was electrically operated, was ringing at the time of the accident; that the regular crossing signal had been given by blow-

ing the whistle, and that what is known as a back-up signal had also been given in the same way; that air-operated brakes were applied, and, in short, their testimony is that, on approaching the crossing, the train was operated in the usual way, regular warnings given, and the train stopped as soon as it could be stopped after the danger of the occupants of the automobile was realized.

On the other hand, five people who were occupants of the automobile, testified in the case. As stated above, three of the original occupants lost their lives in this accident, and one was in the army and did not testify. The remaining five all say that no lights were burning on the tender, the bell was not rung, and that no crossing signals were given. According to their statements, the employees of the railway company did nothing to afford any warning that they were about to take their train over this crossing.

There is other evidence on this point, which illustrates the fallibility of human testimony in matters of this character. One witness, who was driving an automobile in the same direction as the one involved in the accident, says that he saw the light burning on the tender before the accident, but did not hear the bell or the crossing signal. Another witness, coming from the opposite direction, heard the crossing signal and bell but did not see the light. Residents of the village were awakened by the crash and heard the bell ringing, but had not heard the crossing signals. One witness testified that she paid no attention to crossing signals, because there were so many of them they made no impression on her. An employee of the company, a conductor, not on the train at the time, but some distance down the sidetrack beyond the crossing, says that the lights were burning on the tender, the bell was ringing and that he heard the crossing signal. This, in addition to the regular trainmen. There seems to be no dispute that a few moments after the accident, when people began to assemble, the bell was still ringing, and the lights were burning on the tender. But for the testimony of the five people who occupied the automobile, it would seem clear and beyond doubt that the locomotive

was operated in the ordinary way, and without negligence; but the testimony of these five witnesses is entitled to such consideration as the circumstances warrant, and ordinarily would be a matter for jury appraisement.

Another disputed question is whether there was contributory negligence on the part of Milam, the driver of the automobile under such circumstances as would warrant us in charging the same against plaintiff's decedent and prevent recovery by her administrator. This involves the question of whether Milam and the others in this automobile were intoxicated. All of these young people had spent the evening together. Whatever was done in that party was known to each and every member of it. Two witnesses testified that at least some of the members of the party were intoxicated at a beer parlor earlier in the evening. Five clearly disinterested witnesses, who came to the place of the accident immediately thereafter, state that there was the odor of liquor in the automobile; that a pint bottle about three-fourths full of moonshine liquor was found there; that a glass jar, having the odor of moonshine liquor, was found, and broken glass was found in the automobile. Another witness, an employee of the company, makes the same statement. Of the five witnesses first mentioned, two of them were state troopers; another was a Mullens policemen; another was an employee of a state liquor store. The five occupants of the automobile who testified were inquired of concerning the matter of intoxication, and each testified that no one in the automobile was intoxicated, and that there was no liquor there, and absolutely contradict the statement of witnesses who testified as narrated above. They all say than none of the young women drank anything other than soft drinks, and two of the men testified to drinking two bottles of beer at different times, the last one about ten-thirty the evening before the accident, or some three or four hours earlier. A number of witnesses who were about the scene of the accident testified that they did not detect any odor of liquor about the automobile. The evidence as to the absence of liquor was introduced by plaintiff as a part of his case in chief, and the evidence to con-

46

tradict it was, of course, put in by the defendants below after the plaintiff had made out his case on that point.

It is apparent that the plaintiff's case must rest upon the testimony of the five people who were in the automobile at the time of the accident and who testified in the case. It should not be overlooked that these witnesses are contradicted by more than double their number of witnesses, most of whom can have no possible interest in this case, although not on the same point.

The position of the plaintiff below is (1) that the defendants were guilty of negligence in the operation of the locomotive and train in the particulars mentioned above; (2) that even if Milam, the owner and operator of the automobile, was guilty of contributory negligence, his negligence cannot be imputed to plaintiff's decedent, and that the defendants being guilty of negligence, he is entitled to recover, notwithstanding possible contributory negligence on the part of Milam; and (3) that even if Milam was guilty of contributory negligence, and that the same could be imputed and charged to plaintiff's decedent, recovery should, nevertheless, be had against the defendants under the doctrine of the last clear chance, because, he says, that after Smith, the engineer, saw the position of peril of plaintiff's decedent, he had ample time to stop the locomotive and avoid the accident, and an instruction to that effect was given at the instance of the plaintiff.

On the first point, we are of the opinion that the evidence, properly appraised, does not show negligence on the part of the defendants. Inasmuch as there must be a new trial in this case, the Court is not disposed to elaborate on the reasons which impel its view, other than the discussion which follows on the doctrine of the last clear chance.

On the second point, the Court is of the opinion that, there being no primary negligence on the part of the defendants, the question of contributory negligence does not arise. The driver of the automobile was guilty of negligence in the operation thereof, and such negligence was the proximate cause of the accident. The testimony with

respect to intoxication, or at least the use of intoxicating liquor by some of the parties, is, therefore, immaterial, as it would only bear on the question of whether there should be imputed to plaintiff's decedent the contributory negligence of the driver, had there been such character of negligence.

We hold that the doctrine of last clear chance should not have been applied in this case, and that the instruction given on that point constituted reversible error. We need not elaborate on the reasons for the creation and use of this doctrine, as it has been applied by this Court. A rather full discussion of these reasons will be found in *Smith* v. *Gould,* 110 W. Va. 579, 159 S. E. 53, 92 A. L. R. 28. It has been further discussed in *Emery* v. *Monongahela West Penn Public Service Co.,* 111 W. Va. 699, 163 S. E. 620; *Meyn* v. *Dulaney-Miller Auto Co.,* 118 W. Va. 545, 191 S. E. 558; *Fielder* v. *Service Cab Co.,* 122 W. Va. 522, 11 S. E. 2d 115, and the recent case of *Lynch* v. *Alderton,* decided June 2, 1942, 124 W. Va. 446, 20 S. E. 2d 657. Fundamentals of the doctrine are these: A negligent plaintiff may, nevertheless, recover and avoid the effect of his contributory negligence, if a defendant, under certain well defined and limited circumstances and conditions, could have avoided the accident. This implies knowledge, or means of knowledge, on the part of a defendant of a plaintiff's condition of peril, his ability or inability to escape therefrom, or whether he is oblivious thereto, as defined in the cases cited above. Defendant must have this knowledge, or means of knowledge, before he is precluded from relying upon the defense of contributory negligence. This likewise implies "a sufficient interval of time for both appreciation of the dangerous situation and effective effort to relieve it." *Juergens* v. *Front,* 111 W. Va. 670, 163 S. E. 618; *Milby* v. *Diggs,* 118 W. Va. 56, 189 S. E. 107; *Lynch* v. *Alderton, supra.* In *Waller* v. *Norfolk & Western Railroad Co.,* 108 W. Va. 576, 152 S. E. 13, it was held that:

> "While the matter of liability under the doctrine of last clear chance is ordinarily a question of fact for jury determination, yet, where the physical facts are such as to preclude a basis for the opera-

tion of said doctrine, the court should so declare and should not submit the question to the jury."

Here, the driver of the automobile in question had a clear view of the crossing for a distance of approximately 300 feet. The evidence is that the lights of his automobile were burning and in good condition. He was traveling at the rate of approximately thirty miles per hour, at no time lessened his speed, and the time required to travel the distance from the point in the highway where the crossing came into view to the crossing itself was only seven or eight seconds. The tender of the locomotive, which was traveling at the rate of five miles per hour, must have been at or near the crossing when the automobile first came in view. Traveling at that speed, the train could not have reached the middle of the highway, where it must have been at the time of the crash, from any place except one very near the crossing itself. And so it is, that only a few seconds being involved, there could have been no possible time within which the dangerous situation of the occupants of this automobile could have been realized and effective efforts made to prevent the accident. In the first place, the locomotive had the right of way. *Tri-City Traction Co.* v. *Shepherd,* 123 W. Va. 227, 15 S. E. 2d 592. And the engineer had the right to assume, as he says he did, that the automobile would stop before it reached the crossing. Later, and some time must have passed, he did realize that the automobile was not being stopped, and then he did what he could. He was not called upon to assume that the automobile would not stop until it was too late to avoid the accident in any other way than the stopping of the automobile. In the situation presented, it seems clear that nothing could have been done to prevent this accident, except a stopping of the automobile. We think the physical facts show beyond all question of doubt that at the time the engineer saw the automobile in its position of peril, the tender of his locomotive must have been very close to, if not on, the highway, and this notwithstanding his estimates of distance. Whether these estimates were based upon the engineer's

position in the locomotive, and whether it referred to his individual distance from the crossing rather than the distance of the tender, we do not know.

The doctrine of last clear chance should be applied in a reasonable manner. It was never intended to create a new ground of recovery, except where it clearly appeared that a defendant, notwithstanding the negligence of a plaintiff, could, in fact, have prevented an injury. The foundation and seeming necessity for the rule is to prevent callous indifference from operating in favor of a defendant who may assume that he is protected against responsibility for his own negligence because, forsooth, a plaintiff is likewise negligent. That is not the case before us. There was no indifference here on the part of the employees of the railway company. They were pursuing their avocation in the usual and ordinary way, and have not been shown negligent. The driver of the automobile was clearly guilty of negligence. The statements that neither he nor anyone in his automobile saw a light, heard a bell or whistle are, no doubt, true, because their attention was directed toward other things. Milam and plaintiff's decedent knew of the crossing and should have been on guard, and their failure in that regard constitutes negligence. Milam, with a straight road ahead, his lights burning, and a locomotive on or near a crossing, with reckless disregard for his own safety and that of his guests, plunged ahead, and we think that when danger first became apparent to the engineer on the locomotive, it would have been impossible for him to take any steps to avoid the accident. In such case, there is no place for the application of the doctrine of the last clear chance.

The judgment of the Circuit Court of Raleigh County is reversed, the verdict of the jury set aside and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*

LOVINS, JUDGE, concurring:

There is no factual basis shown in this case for the application of the doctrine of the last clear chance. It

was error to give instruction No. 8 offered on behalf of the plaintiff, which authorizes the jury to find for the plaintiff on the basis of that theory.

The evidence was not sufficient to show that the engineer of the locomotive had "a sufficient interval of time for both appreciation of the dangerous situation and effective effort to relieve it." *Juergens* v. *Front,* 111 W. Va. 670, 163 S. E. 618. Therefore, I concur in the reversal of the judgment of the trial court.

I do not agree that the evidence in this case shows that there was no primary negligence on the part of the defendant as a matter of law. I am mindful that the "scintilla" rule is not followed in this jurisdiction, and further that courts are not required to believe unreasonable testimony. Certainly, the testimony of the five witnesses who testified that the whistle was not blown, that the bell was not rung, and that the light on the rear of the locomotive tender was not burning constitutes more than a "scintilla" of evidence. Moreover, such testimony is reasonable, and a jury would have the right to believe it. The evidence on behalf of the plaintiff made a *prima facie* showing of negligence on the part of defendants, and countervailing evidence for the defendants created an issue of fact which required determination by the jury. The fact that ten or more persons who testified for the defendants dispute the testimony of the five who testified for the plaintiff in no way determines the weight of the evidence, as the credibility of witnesses, being the principal element involved in weighing oral evidence, is entirely within the province of the jury. There are obvious and cogent reasons for submitting issues of fact to a jury which have been long-established and approved in our system of jurisprudence, and being obvious it is not necessary to mention them. In my opinion there was sufficient oral testimony before the jury in this case which, if believed, would establish the primary negligence of the defendants.

I am authorized to say that Judge Riley concurs in this note.