ELMER HAROLD PARSONS *v.* THE NEW YORK CENTRAL RAILROAD COMPANY

(No. 9676)

Submitted April 11, 1945. Decided May 15, 1945.

620

*Alex M. Mahood* and *W. H. Belcher,* for plaintiff in error.

*Watts & Poffenbarger* for defendant in error.

RILEY, JUDGE:

In this action of trespass on the case the defendant, The New York Central Railroad Company, prosecutes this writ of error to a judgment of the Circuit Court of Kanawha County in plaintiff's favor in the amount of two thousand dollars based upon a jury verdict.

Plaintiff was injured about three-forty o'clock in the afternoon of December 24, 1943, as a result of a collision between defendant's locomotive, which was traveling in an easterly direction on defendant's main line in the vicin-

ity of the E. I. du Pont de Nemours plant at Belle, an unincorporated village in Kanawha County, and a three-quarter ton truck operated by one Guy Potter, plaintiff's employer. The collision occurred at an open country public highway crossing known as the "du Pont Club House Crossing", leading from United States Route No. 60, which parallels defendant's track on the south, to the club house, maintained for the benefit of the employees of the du Pont Company, situated on a hill on the opposite side of the track.

At the point of the collision the railroad company's track ran in what the defendant termed an easterly and westerly direction, the city of Charleston being to the west and the village of Belle to the east of the crossing. About ten feet beyond the crossing in the direction of the club house a public road known as the Simmons Creek road turns to the right, or in an easterly direction, and the road leading to the club house turns to the left up the hill upon which the club house is located. For a distance of one hundred thirteen feet it almost parallels the railroad track, and then curves to the right in a general easterly direction to a driveway running in front of and to the rear of the club house. Defendant's railroad track is straight for a distance of at least a half mile west of the crossing.

Plaintiff was seated in the front seat of the truck between the driver, Guy Potter, and another employee, James Findley. The seat of the truck comfortably accommodated the three occupants, and was covered by a cab having doors on each side, with windows which at the time were open. Behind the seat of the cab there was a small glass window. Shortly before the collision the truck approached the crossing from the direction of Belle en route to the club house, but was stopped at the crossing in order to allow the passage of a train. It then proceeded to the club house where a delivery of merchandise was made, and was returning down the private road to the crossing where the collision occurred. At the same time defendant's locomotive was approaching the crossing in almost the same direction. From the time the truck left

the club house until it reached the curve, which, as heretofore stated, was about one hundred twenty-three feet from the crossing, the view of defendant's railroad track was obstructed by a house on the hill near the curve. At the curve defendant's track came into view.

The evidence varies as to how far west of the crossing the railroad track could be seen by the occupants of the truck when the track first came into view at the curve. J. D. Moore, a civil engineer, testified for plaintiff that as one descends from the club house before arriving at the point where the railroad track first came into view, the track could be seen a distance of about three hundred feet west of the crossing and a person walking on the track can see an automobile at the same point on the road leading to and from the club house when approximately seven hundred forty-eight feet west of the crossing. Plaintiff testified that at the curve one could see the railroad for a distance of about seven hundred feet west of the crossing; that after turning the curve only fifty to seventy-five feet of the railroad could be seen from the truck, and that was to the front of the truck. T. C. Huff, a member of defendant's engineering corps, testified on behalf of defendant that at the curve in the road he could see a man standing in the center of the track eleven hundred eighty-five feet west of the crossing.

Defendant's locomotive, running light, was equipped with good brakes and in good mechanical condition. The locomotive was sixty-five feet long, fourteen feet, three inches high, measured from the rail to the top of the smokestack. The locomotive, according to various witnesses, as it approached the crossing was running between fifteen and twenty-five miles an hour. The truck as it proceeded down the last one hundred thirteen feet of the private road to the right angle turn ten feet north of the crossing was running at a speed variously estimated by the witnesses of three to ten miles an hour.

Plaintiff testified that at the curve near the top of the hill he looked down the railroad track in a westerly direction when the track first came into view and did not see the locomotive approaching, and that he could not

see down the track in the direction from which the locomotive was coming as the truck was proceeding from the curve down the hill for the reason that the locomotive was behind the truck and the window in back of the cab, inasmuch as the one hundred thirteen-foot stretch of the road was not exactly parallel with the railroad track, did not furnish an outlook along the track in a westerly direction. When the truck had traversed the one hundred thirteen-foot stretch and turned at substantially right angles on the ten-foot stretch of the public road, the truck was brought almost to a stop, and plaintiff and his fellow-passenger Findley leaned back in their seats in order to give Potter an opportunity to see up the track and Potter leaned forward, evidently in an effort to obtain a view.

He further testified that both windows of the cab of the truck were open and that the engineer did not give the statutory signals by blowing the whistle and ringing the bell. At the time of the collision, engineer Malone was seated in the right seat of the cab; fireman Bailey in the left seat; conductor Cook was standing just behind the engineer; brakeman Newman was standing in the cab over by the firebox warming his hands, and another brakeman, Sherwood, stood in the gangway between the engine and tender on the right side. These witnesses testified variously as to whether the engineer performed his statutory duty in giving the required signals. Malone testified that he blew the whistle about forty feet east of the whistle post and started the automatic bell of the locomotive ringing before it reached the post. Because he was on the right side of the engine he did not see the truck. He testified, "I just turned the whistle loose and the fireman hollered, 'Blow it again', and I blowed it." Fireman Bailey testified that he saw the truck when it came from behind the house above the curve of the road; that the engineer blew the whistle twenty-five or thirty feet east of the whistle post, and that the bell was ringing when the engineer started to blow the whistle. Conductor Cook testified that he did not hear the whistle blow or the bell ring at the whistle post, but did hear the whistle blow "just before the accident", and heard the fireman tell the engineer to blow

the whistle again. Likewise brakeman Sherwood testified that he did not remember hearing the whistle blow before the engine approached the crossing, but heard the fireman say to the engineer, "Blow the whistle again". Brakeman Newman testified that he heard the whistle blow and the bell ring at the whistle post; that the engineer turned off the whistle for a while but blew it again when the fireman warned him to do so. John Tyson, an employee of the du Pont Company, testified for the defendant that he heard the bell ringing after the collision but he heard neither the bell nor the whistle before the collision. Another employee of du Pont, Harvey Whitlock, a witness for defendant, testified on cross-examination that he did not hear the bell ringing until the time of the collision. Other employees of the du Pont Company, Richard Grady and Vincent Lewis, testified for the plaintiff that they did not hear any whistle blow or bell ring until the collision.

Only two questions are presented by this record: First, was the defendant railroad company guilty of primary negligence which proximately caused plaintiff's injury; and, second, if so, was plaintiff guilty of contributory negligence. In the solution of these questions and appraisal of the evidence contained in this record, we are aided by the rule: "Before directing a verdict in defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence." *Fielder, Admx.* v. *Service Cab Co.,* 122 W. Va. 522, 11 S. E. 2d 115, pt. 1 syl.; *Boyce, Admx.* v. *Black,* 123 W. Va. 234, pt. 1 syl., 15 S. E. 2d 588.

Plaintiff claims that defendant was negligent in failing to keep a proper lookout and neglecting to give the statutory signals of warning. Where, as here, a public crossing traverses a railroad track, a train approaching thereon has the right of way, *Cline* v. *McAdoo, Director General of Railroads,* 85 W. Va. 524, 102 S. E. 218, over a vehicle or pedestrian attempting to cross the railroad track at the crossing. It, therefore, is immaterial that the fireman had

the truck in view from the time it rounded the curve until the point of impact. He had a right to assume that the truck would be stopped before it was driven on the tracks in the face of the oncoming locomotive. The engineer inasmuch as he was on the right side of the locomotive and his vision was blocked by its boiler, did not see the truck until after the collision; but if he had he would have been entitled to entertain the same assumption. So we cannot say that plaintiff's injuries were incurred as the proximate result of the defendant's employees' failure to keep a proper outlook, nor could the jury.

But did the engineer fail to give the statutory warning signals and was such failure the proximate cause of plaintiff's injuries? The burden of proving that such signals were not given, of course, rests upon the plaintiff. *Butcher* v. *West Virginia & Pittsburgh Railroad Company,* 37 W. Va. 180, 16 S. E. 457. Where the evidence conflicts and is credible, the question is one for the jury. *Norvell* v. *Kanawha & Michigan Railway Co.,* 67 W. Va. 467, 68 S. E. 288. On the immediate question the witnesses, as heretofore stated, testified variously. Their testimony presents a conflict in the evidence. "The testimony of one witness, who denies that a railroad whistle was sounded on a given occasion, is as positive evidence as the testimony of another who affirms the fact, where each has equal opportunity of hearing and the attention of the former because of special circumstances is equally drawn with that of the latter to the sounding of the whistle. The denial by the one and the affirmance by the other produces a conflict of evidence, which it is the province of the jury to determine. " *Carnefix, Admr.* v. *Kanawha & Michigan Railroad Co.,* 73 W. Va. 534, pt. 3, syl., 82 S. E. 219. *Casdorph* v. *Hines,* 89 W. Va. 448, 109 S. E. 774; *Jones* v. *Virginian Railway Co.,* 115 W. Va. 665, 177 S. E. 621. Judge Lovins and the writer did not join in the decision in *Weddle, Admr.* v. *Virginian Railway Company,* 125 W. Va. 41, 22 S. E. 2d 698. They have not changed their views stated in the dissent. The jury, in our opinion, had a right to find, as it did, that timely signals were not given which proximately resulted in the collision which caused plaintiff's injuries.

But defendant says that if it was guilty of negligence, plaintiff likewise was guilty of negligence which contributed toward his injuries. Various witnesses testified on behalf of the defendant, including its civil engineer, Huff, that from the curve a locomotive could be seen approaching the crossing from the west at distances ranging from eleven hundred eighty-five to fifteen hundred feet, and counsel for defendant in their brief furnish us with a table showing other comparative locations of the locomotive when the truck was at the curve. If, in fact, an approaching locomotive could be seen from the curve at distances ranging from eleven hundred eighty-five feet to fifteen hundred feet, as defendant's counsel claim, plaintiff, notwithstanding he was seated between the other two occupants of the truck, could, if he had looked when the truck was at the curve, have had a full view of the approaching locomotive. But plaintiff and his witness Moore, testified that at the curve plaintiff's view in a westerly direction was about seven hundred feet. If the truck was proceeding down the hill at three miles an hour and came almost to a stop immediately before it proceeded on the track, and the locomotive was being operated at a speed of twenty-five miles an hour, as the jury was justified in believing from the evidence, the locomotive would have been more than one thousand eighty feet west of the crossing as the truck rounded the curve, and taking as true plaintiff's evidence as to the view afforded at the curve and the evidence most favorable to plaintiff as to the comparative speeds of the locomotive and truck, as we must do under the rule of *Boyce* v. *Black, supra,* the locomotive would not have been in sight as the truck was turned down the one hundred thirteen-foot stretch in a direction almost parallel with the track. Defendant says, however, that notwithstanding the locomotive may not have been in view of the truck when it rounded the curve, plaintiff was under a duty to look and listen effectively for the locomotive, and to warn Potter of its approach before the truck was driven on the crossing. In *Gray, Admr.* v. *Norfolk & Western Railway Co.,* 99 W. Va. 575, 130 S. E. 139, and in *Krodel* v. *Baltimore & Ohio Railroad*

*Co.,* 99 W. Va. 374, 128 S. E. 824, it was held that failure of the engineer on a locomotive approaching a public crossing to give the statutory signals does not relieve a traveler from the duty to use ordinary care and caution for his safety before attempting to cross the track at such crossing. This Court has receded from the position which it took in the case of *Cline* v. *McAdoo, Director General of Railroads, supra,* that the driver of a vehicle approaching a public railroad crossing is under the absolute duty to stop, as well as look and listen. *Gray* v. *Norfolk & Western Railway Company, supra; Bonar* v. *Baltimore & Ohio Railroad Co.,* 91 W. Va. 462, 113 S. E. 766.

If Potter was negligent, in the absence of a joint enterprise, his negligence cannot be imputed to plaintiff. *Jameson* v. *Norfolk & Western Railway Co.,* 97 W. Va. 119, 124 S. E. 491. And because plaintiff, being Potter's employee, had no voice in directing and governing the movements of the automobile, the relation of joint enterprise did not exist between them. *Horchler* v. *Van Zandt,* 120 W. Va. 452, 199 S. E. 65. But, of course, plaintiff was under a duty to use "such reasonable care for his own safety as an ordinary prudent person would exercise under like circumstances." *Jameson* v. *Norfolk & Western Railway Co., supra.* In the circumstances of this case, we think the jury had a right to find that the plaintiff exercised such reasonable care for his own safety. When the truck was turned into the public road immediately before attempting to cross the railroad track, it had come almost to a stop. At that point an individual occupant of the truck by looking through the right window of the cab had a clear view in a westerly direction along the track; but the window of the cab was small and Potter was seated on the extreme left side. The jury, in our opinion, had a right to find that all three occupants of the truck could not at the same time have looked out the window and back toward the approaching locomotive. Both Findley and plaintiff at the very instant it would have become plaintiff's duty to look, if he had been the driver of the truck, leaned back in their seats in order to give Potter full opportunity to look beyond their bodies. Plaintiff saw Pot-

ter lean forward, evidently in an attempt to observe whether a train or locomotive was approaching. It may be that if Findley and he had leaned forward at that instant, the driver's view would have been blocked. At least the jury so found. Such finding, in our opinion, was justified by the circumstances surrounding the plaintiff at the time the collision occurred. We cannot say as a matter of law that plaintiff's action in attempting to afford Potter a clear view was not the exercise of reasonable care for his own safety which the law requires.

The judgment of the trial court therefore is affirmed.

*Affirmed.*

LOVINS, PRESIDENT, concurring,

I concur in the result, but I do not think the fourth point of the syllabus is a point of decision or applicable to the facts disclosed by the record in this case. The fourth point of the syllabus herein treats of an exception to a general rule of the law of evidence as to the probative value of positive and negative testimony. A statement of this general rule will be found in Note, 98 A. L. R. 161, in the following language: "It has long been recognized as a general rule of evidence that, all other things being equal, positive evidence is stronger than negative evidence." See Note, 98 A. L. R. 161, for a discussion of the principle and collation of cases, and 20 Am. Jur., Title, Evidence, Section 1186. This general rule is impliedly recognized in *Carnefix* v. *Railroad Co.*, 73 W. Va. 534, 82 S. E. 219, and an exception thereto is correctly defined. In the *Carnefix* case it was shown that some of the witnesses who testified that the locomotive whistle was not blown were workmen who had been accustomed to commence their work upon hearing the sound of the whistle. It was further shown that on the morning of the fatal accident the whistle signal for the crossing was not given. The basis for the syllabus point quoted in the opinion herein will be found in the third point of the syllabus of *Southern R. Co.* v. *Bryant*, 95 Va. 212, 28 S. E. 183. In the *Bryant* case there were numerous special circumstances which directed the

attention of the witnesses testifying that the whistle was not blown. After setting forth the reasons why the witnesses were listening, the opinion in the *Bryant* case states: "All three of these men were, for these reasons, listening intently to catch the first sound of the approaching train. They knew that it was due or past due, and were momentarily expecting it, and dreading its approach. With their attention thus fixed upon the coming of the train, and painfully on the alert, they all swore that the train passed by the whistling post for the crossing, where its whistle should have been blown, and rushed past them without sounding the whistle."

In this case the record is devoid of any special circumstances which directed the attention of the witnesses who testified that the whistle was not blown, and therefore, in my opinion, the syllabus stating an exception to the general rule hereinbefore noted is not sound when applied to the facts of this case. My concurrence in the result is based on other considerations expressed in the syllabi points not discussed in this note.