# CHARLESTON.

GROVER C. KELLEY *v.* KANAWHA & MICHIGAN RAILWAY
COMPANY

(No. 5040)

Submitted May 20, 1924.   Decided June 9, 1925.

1. RAILROADS — CROSSING ACCIDENTS — *Question of Whether Whistle Was Blown or Bell Rung One of Fact to be Determined by Jury.*

   Where there is testimony of witnesses that a locomotive whistle was blown or bell rung on a certain occasion, and equally positive testimony of others in a position to observe the same that neither was sounded, the question of fact must be determined by the jury.

2. SAME—*Traveler on Highway Will Not be Held Guilty of Contributory Negligence Unless it Appears That He Could See Far Enough Along Track to Cross Same Before Approaching Train Out of His Range of Vision Could Reach Crossing Before He Was Over or Due Warning of Approach of Train Was Given by Bell or Whistle.*

   While it is the duty of a traveler on a highway approaching a railroad crossing to exercise care proportionate to the danger, and to look and listen, and stop if necessary, and to select a position from which an effective observation can be made, he will not be held guilty of contributory negligence as a matter of law, unless it conclusively appears that he could see far enough along the track to cross the same before an approaching train out of his range of vision could reach .the crossing before · he was safely over, or that due warning of the approach of the train was given by bell or whistle.

Error to Circuit Court, Putnam County.

Action by Grover C. Kelley against The Kanawha & Michigan Railway Company.   Verdict and Judgment for plaintiff, and defendant appeals.

*Affirmed.*

*Byrne, Littlepage, Linn* and *Kelly & Watts,* for defendant in error.

*W. M. King* and *Leroy Allebach,* for plaintiff in error.

MILLER, JUDGE:

By his action plaintiff sought to recover damages for personal injuries and the destruction of his auto-truck resulting from a collision with one of defendant's passenger trains at a railroad crossing. From a verdict and judgment for plaintiff in the amount of $10,000.00, defendant has appealed.

Just before the accident plaintiff was driving southward on the public highway along the west side of the railroad right of way and between it and the Kanawha river about three quarters of a mile south of the station of Red House, and while attempting to cross the railroad track at the Montague crossing his truck was struck by defendant's northbound train. The act of negligence on the part of defendant relied on was the failure of the engineer in charge of defendant's engine to give warning of the approach of the train by ringing the bell or sounding the whistle, as required by section 61 of chapter 54 of the Code. This statute provides that the bell shall be rung or the whistle sounded at a distance of at least sixty rods from the place where the railroad crosses any public street or highway, and be kept ringing or whistling for a time sufficient to give due notice of the approach of the train before such street or highway is reached. Defendant relies on the contributory negligence of plaintiff.

Plaintiff testified that he almost stopped his truck at a point thirty-five feet from the crossing, raised up from his seat, listened, and looked in both directions before proceeding to cross the track, and that he did not see or hear the train, and did not hear the bell or whistle at any time. He says he was first aware of the approaching train after he had entered upon the crossing, and that he was driving a mile and a half or two miles an hour as he approached and entered the track at the crossing. The truck was struck by the train about the time the front wheels passed the second rail. Plaintiff was severely injured, his father, who was riding on the seat with him, was killed, and the truck was completely destroyed.

The engineer was on the outside of the curve and did not see the truck. The fireman testified that he saw the truck about fifteen feet from the track when the train was 125 or 150 feet from the crossing, and that the engine was 50 or 75

feet away when the front wheels of the truck reached the first rail. The train was traveling at a speed of 50 to 55 miles an hour, according to the testimony of the engineer. As soon as the fireman saw plaintiff's danger he warned the engineer, who shut off the steam and applied the brakes. The train stopped about two car lengths over the crossing.

There is much conflict of evidence between the plaintiff's and the defendant's witnesses. The engineer, fireman, conductor and others testified that the whistle was blown for the crossing. A number of residents in the vicinity testified that no whistle was blown north of the lower end of Courtney siding, estimated by them to be from three-quarters of a mile to a mile and a quarter from the scene of the accident. Some of them said that it was two or three minutes from the time the last whistle was blown until the train reached Montague crossing. Three of these witnesses were listening for the train, in order that they might reach the station of Red House in time to cross the river on the ferry boat with the passengers from the train. Others were so situated that they were in a position to know whether the whistle was blown or not. From the evidence we can not say that the jury were not justified in finding that the whistle was not blown at a point near enough to the crossing to warn plaintiff of the approach of the train. To undertake to do so would be to invade the province of the jury. Carnefix v. Railroad Co., 73 W. Va. 534. There is no evidence that the engineer continued to blow the whistle for a sufficient time to give due notice of the approach of the train: wherever the whistle was sounded, the evidence is that two long and two short blasts were blown. The engineer testified that the bell was kept ringing from the time he blew the whistle until the train stopped; and others testified that the bell was ringing when the train reached the crossing; but this evidence also is controverted.

Defendant contends that plaintiff was negligent in approaching and entering upon the crossing. From the place where plaintiff first looked and listened, his view of the track in the direction from which the train was coming was to some extent cut off by trees and bushes. He says that there was "a lot of brush on the right of way there, that had me cut off

seeing where the train was at that time; those bushes and brush had the view cut clear off." He further says: "I couldn't say that the car actually stopped, when I had the engine thrown out of gear, it was kind of driving up the little hill, you understand, and I would not say that the car actually stopped, but it just about stopped; it was just about to stop to the best of my knowledge. I sat back down, eased back into my seat and just eased the gas to my car and went on very slowly, about one mile and a half an hour, I guess, something like that, on to the crossing. The train and me were just right together when I first saw it, as near as I could tell." He says the front wheels of the truck had just reached the second rail when the train struck it. When asked if he was looking and watching at the time he entered onto the track, he answered: "Yes, sir, I was."

N. S. Raynes, a witness for defendant, who owned the property adjoining the right of way at the crossing, testified that, "there was a locust tree that stood as you came from Red House, or the way the truck was going, there was a locust tree that was possibly twenty-five feet away and you could not see for the locust tree; it was very bushy and stood there, possibly twelve feet high. Then there was some brush and sumac growing up, and then there was a wild cherry tree cut off and the stump left there, with the brush around it and practically everything growing up around it; possibly you could not see. It would hide the view possibly, I do not know that. * * * But after you got up to the point about fifteen feet away you might have a better view. You could not see better farther up the track. I would not say you could not see when you got up closer to the track." He further testified that the locust tree was off the right of way, on his land adjoining, and that the wild cherry bush was still farther under the bank, standing somewhere over and down below the top of the bank. The witness Strauss, assistant engineer of the New York Central Railroad Company, filed with his testimony a map drawn to scale, showing the territory surrounding the crossing where the accident occurred. He testified that the drawing filed by him shows that one coming up the highway parallel to the railroad could see a

train at a distance of 188.4 feet from the crossing; and that a man seated in a Reo truck thirty feet from the crossing could see a train 249.2 feet away. But the map from which he testified shows that the locust tree had been removed, and the stump still located on the right of way, about twenty-five feet from the nearest rail, according to the scale of the map. The accident occurred August 23rd, and Strauss was there October 11th. He says he did not know the condition of the right of way and track on August 23rd.

None of these witnesses say how far plaintiff could have seen the train at any point between the crossing and the place where he "almost stopped" and first looked. Nor is it shown how steep the approach to the crossing was, nor at what point plaintiff's eyes would have been high enough to see over the embankment between the track and the river. There is some evidence that the train came out of a cut onto the crossing, but it does not appear how high the earth between plaintiff and the approaching train was at the time.

It is the duty of one approaching a railroad crossing to look and listen from a position where looking and listening will be most effective. *Robertson v. Monongahela Power & Ry. Co.,* 99 W. Va. 356, decided at this term. But here it does not affirmatively appear that plaintiff could have seen the approaching train from a point of safety before entering the crossing. With the train traveling at a speed of 50 to 55 miles an hour—73 to 80 feet a second,—taking the distances Strauss says plaintiff could have seen the train from the points fixed by him, only two or three seconds would have elapsed from the time the train came in view until it reached the crossing; and as it does not appear that plaintiff could have had a more advantageous view of the track at any time after he first looked, can it be said that he would have had time to cross the track after the train came in sight, even if he had stopped as near as he safely could?

Unlike the Robertson case, cited above, where defendant's trolley car was moving seven miles an hour or less, and where plaintiff first saw the car when he was thirty feet or more from the crossing, and could have seen the track for some distance until he reached the crossing, but was moving so rapidly that he could not stop in time to avoid running into

the car, it does not affirmatively appear in this case that from any point plaintiff could see far enough along the track to give him time to cross in safety, even if he had stopped as near the track as possible; for possibly the rapidly approaching train would have run the distance he could see before he could start his car and cross the track.

And while it is the duty of a traveler crossing a railroad track to look and listen, and stop if necessary, and to select a position from which an effective observation can be made, and exercise care proportionate to the danger, unless it conclusively appears from the record that plaintiff's own conduct was the proximate cause of his injuries, the question of his negligence is one for the jury. *City of Elkins* v. *Railway Co.*, 76 W. Va. 733; *So. Ry. Co.* v *Bryant's Admr.*, 95 Va. 212. We think this case comes within the principles controlling the cases just cited. In the *City of Elkins* case, it appeared from the evidence that plaintiff's drivers could not get a view of the track without getting down from their wagon and going forward, and it was held that the facts and circumstances in evidence presented a question for the jury. In the Virginia case the evidence tended to show that if the plaintiff's intestate had left his team and gone to the track and looked, the topography of the country and the curvature of the track were such that he could have seen but a short distance, and by the time he could return to his team he would have had no better knowledge of the situation than if he had not gone to look. In that case the court held: "A traveler about to cross a railroad, at a public crossing, is excused from the duty of looking for approaching trains when looking would be unavailing on account of obstructions to the view. If injured in attempting to cross under such circumstances the propriety of his going upon the track is a question for the jury to determine." But here plaintiff says he was looking when he went upon the track, and no one testified that he was not. The locomotive fireman says he could not see the driver of the truck. The rule requiring the traveler to look and listen from a position where an effective observation can be made necessarily presupposes that there is some point from whicl he can see. It would be unreasonable to require him to select a position from which he can see, if it appears that there is no

safe point of observation. Here it does not appear that there was a point from which plaintiff could see the train far enough away to enable him to cross the track in safety, nor does it appear that there was not. Under such circumstances we can not hold as a matter of law that he was guilty of contributory negligence.

Defendant complains of the refusal of its instruction number 1-A. This instruction would have told the jury that plaintiff in approaching the crossing, must be held to have heard such signals, given by the engineman on the locomotive engine, as were heard by other persons no better situated to hear the same than he was. This instruction assumes that signals were given. As to defendant's negligence in such cases, the question is whether or not the signals were given; and in this case the jury were instructed that if they found from the evidence that either the whistle or bell was sounded for a time sufficient to give due notice of the approach of the train, the verdict must be for the defendant. Under this instruction the jury were required to find for the defendant if they found that due notice was given, regardless of the situation of the plaintiff or of any of the witnesses who heard the whistle or bell.

We have examined all the other instructions given and refused, and find that those given fully cover every phase and theory of the case. The question of contributory negligence was fully and properly submitted to the jury.

The judgment will be affirmed.

*Affirmed.*