GLADYS TAWNEY, ADMX., *etc.*

*v.*

M. C. KIRKHART, *et al.,* DFTS. BELOW, M. C. KIRKHART, P. E.

(No. 9863)

AND

GLADYS TAWNEY, ADMX., *etc.*

*v.*

M. C. KIRKHART, *et al.,* DFTS. BELOW, THE BALTIMORE AND OHIO R. R. Co., P. E.

(No. 9860)

Submitted September 16, 1947. Decided October 21, 1947.

*Ambler, McCluer & Davis, S. P. Bell* and *Harper & Baker,* and *Rummel, Blagg & Stone,* for plaintiffs in error.

*William S. Ryan,* for defendant in error.

*Jackson, Kelly, Morrison & Moxley, amicus curiae* on behalf of West Virginia Coal Association and West Virginia Manufacturers Association.

KENNA, JUDGE:

To a judgment for $8,000.00 recovered in the Circuit Court of Roane County in an action of death by wrongful act brought by Gladys Tawney, Administratrix of the Estate of Henry Clay Tawney, deceased, against M. C. Kirkhart and The Baltimore and Ohio Railroad Company, a Corporation, the defendants below each prosecutes a separate writ of error, the accident in which plaintiff's

decedent met his death having occurred at a public crossing of the Baltimore and Ohio Railroad near Big Chimney, Kanawha County, at approximately 8:00 o'clock on the morning of April 21, 1945, when a truck in which decedent was riding was struck by one of the named railroad's passenger trains traveling on scheduled time from Charleston to Grafton.

In order to clearly state the assignments of error it will first be necessary to state the circumstances of and preceding the accident.

Henry Clay Tawney lived near Newton, a hamlet in Roane County between twenty and twenty-five miles northeast of Clendenin and not far from the Clay County line. He was employed by the United Fuel Gas Company as one of a crew to do repair work on its pipe lines and other outdoor work. M. C. Kirkhart, one of the defendants, was the work foreman in charge and as such was furnished with a three-quarter ton Ford pickup truck covered by a canvas top supported by a metal framework and held in place by being fastened to the sides of the truck's body. The truck he kept at his home, also near Newton, and used for the purpose of carrying to and from their work the members of the crew that worked under his direction and hauling their tools. The crew, on this occasion, was fourteen in number and its members lived near either Newton or Clendenin or on or near the road between. The general foreman lived near Clendenin, and it was customary for Kirkhart, and evidently others, to report to him at the time the day's pay began at about seven-thirty A. M. in order to receive instructions as to the nature and location of the work for the day. Kirkhart would then with the truck take the crew to the first of the day's jobs, on this occasion several miles south of Big Chimney and reached from Clendenin by following State Route 119 which crosses Elk River between Big Chimney and a railroad station on the other side of the river known as Bream.

On the morning of the accident Kirkhart had picked up most of his repair gang before he reached Clendenin. There he stopped at the home of the general foreman, got directions for the day, and proceeded toward the location of the first of the day's work. As he started across the bridge at Big Chimney he, as usual, was driving the truck, with Ashley sitting next to him on the driver's seat and Hensley on the right side. This left twelve men in the body of the truck under its tarpaulin cover which was closed at the front, it having a small isinglass window, and open at the back. After crossing the bridge the truck was traveling slowly with decreasing speed, so that when it approached the railroad one hundred and seventy-four feet distant it was barely creeping. It was there that between 7:55 and 8:00 o'clock it was struck by a B. & O. train. Since the truck was thrown approximately forty feet forward and to the left where it was found upright on all four wheels, it is unlikely that it reached the track.

Since both M. C. Kirkhart and the Baltimore and Ohio Railroad Company are defendants in this action and since their interests, as disclosed by the testimony, to a large extent conflict, they appeared and pleaded separately in the court below, and here, as stated, they prosecute separate writs of error. The assignments briefed and submitted by the Baltimore and Ohio Railroad Company or the points to which those assignments were reduced by its counsel are as follows:

That it was error for the trial court to refuse the railroad defendant four peremptory challenges in denying it a panel of twenty-four jurors; that the court erred in refusing to direct a verdict in its favor; that the fireman and engineer maintained a reasonable and proper lookout; that the fireman, he being the only person who could view the crossing from the engine, had a right to assume that the truck would stop and permit the train to pass; that the plaintiff has failed to show that crossing signals were not given and that the failure to give the crossing signals was the proximate cause of the death of plaintiff's decedent; that the statutory warning signals were given as

is shown by the overwhelming weight of the positive, as distinguished from the negative, testimony; that Kirkhart was under a positive duty to stop, look and listen effectively, and that his failure to perform that duty was the sole cause of the accident; that Kirkhart was negligent in failing to observe the train approaching; that the sole proximate cause of the accident was Kirkhart's negligence; that plaintiff's decedent was guilty of contributory negligence; that the verdict is against the clear preponderance of the testimony; and that Kirkhart is liable regardless of the compensation act. The railroad company also assigns as error the refusal of the trial court to give its instructions Numbers 13 and 18, which will be discussed in connection with other assignments.

Kirkhart's contention is that he exercised reasonable care and that the accident occurred due to the heavy fog limiting visibility and to the fact that the Baltimore and Ohio Railroad Company failed to give the crossing signal and failed to maintain a proper lookout. Kirkhart also contends that because of the fact that he is an employee of the United Fuel Gas Company, a subscriber under the West Virginia Workmen's Compensation Act, and the accident occurred during the course of and as a result of his employment, he is protected by the compensation coverage of his employer, and, even in the event of his negligence, is not liable.

The declaration in this case charges concurrent negligence, which is separate acts of negligence operating simultaneously without either, or any, of which the injury would not have occurred, the liability for negligence not necessarily resting upon its being the *sole* cause of an injury. However, if it can be established that one tort feasor's conduct was the sole cause of the injury, that fact, of course, excludes concurrent liability. As between the two defendants that is the contention here.

We will deal first with the assignment that it was error not to direct a verdict in favor of the Baltimore and Ohio Railroad Company because its discussion will re-

quire a detailed account of the testimony that will serve also to throw light on the other assignments.

The negligence of which the railroad defendant is accused is the failure to maintain a proper lookout and the failure to comply with the provisions of Code, 31-2-8, by giving signals of the approach of its train to the Bream Crossing at a distance of at least sixty rods therefrom and to continue signals for a time sufficient to give due notice of the train's approach. We are of the opinion that on both these questions there was conflict in the testimony with the result that there was sufficient evidence on both sides to have sustained a verdict in favor of either.

As to maintaining a lookout, the testimony of the engineer, whose seat was on the right of the cab is to the effect that a slight curve to the left in the railroad track a short distance below Bream caused the boiler of the locomotive to obstruct his view of the track, making it impossible for him to see the crossing in time to have stopped or slowed down his locomotive in order to prevent a collision thereon. There was a plat introduced by the railroad company showing the curvature of the track at the point in question. No dimensions of the locomotive's boiler, said by the engineer to have obstructed his vision, appear in this record. Therefore we are of the opinion that the jury could consider the curvature of the track shown by the plat as conflicting with the testimony of the engineer that the boiler obstructed his vision of the crossing. During his examination in chief the engineer stated that the train left Charleston at seven-forty and arrived at Bream at seven forty-seven, the distance being eight miles. This statement was not corrected on his examination in chief and his effort to correct on his cross examination leads to further confusion.

The fireman testified that it was a clear, damp morning and that he saw the truck while the locomotive was some distance from the crossing at Bream but that it was going very slowly and that he at first assumed that it was going to stop. This testimony conflicts with that of the

plaintiff to the effect that there was a heavy fog. He did not call the engineer's attention to the truck until it became evident that the danger of a collision was imminent. He then shouted to the engineer who at once applied the emergency brake, used sand, and did what he could to stop the train. It was then too late. In maintaining a lookout, particularly in a hilly country with winding roads, it is the joint responsibility of the engineer and the fireman, and since the fireman's duty can be effectively performed only by informing the engineer who controls the movement of the locomotive, it will not do to say that the duty of maintaining a lookout is sufficiently performed by the fireman informing the engineer when a crash is imminent. The cases cited by counsel for the railroad plaintiff in error to the effect that the servant of the railroad may assume that a vehicle approaching a crossing intends to stop instead of crossing before an approaching train we believe is another way of stating that the railroad has the right of way, and is subject to the same qualifications.

As to the question of the crossing signals, there is a decided conflict in the testimony. All of the surviving passengers of the truck, with the exception of three, testified positively that the bell did not ring nor the whistle blow. Added to this is the testimony of a man by the name of Lucas who was standing at the crossing eight feet from the south track and who says that the whistle was not blown nor the bell rung at the whistling post for the Bream Crossing nine hundred and fifty-six feet to the west, although the whistle was blown for the Granny's Branch Crossing approximately three-quarters of a mile farther to the west. The testimony of a Mrs. Belcher, whose home was near the railroad track and about five hundred feet above Bream Crossing, is that the whistle was not blown nor the bell rung. She says it was her custom to listen because she sent her children to school on a bus that went by her home a few minutes after the train ran and that although the accident happened on Saturday, as a matter of habit she was listening that morning

as well. Houston Copen, who lived in one of the other houses in the same row that Mrs. Belcher's home was in, testified that he was listening that morning for the crossing signal in order to watch the train go by, as was his custom, but that the signals were not given. As opposed to this testimony the defendant introduced the engineer, fireman, baggage master, two postal clerks and a miner who lived on the north side of the Elk River, all of whom stated positively that the whistle was blown at the Bream whistle post and some of whom testified that the bell was rung also.

The principal contention of the defendant railroad company in connection with this testimony concerning the giving of the signals is to the effect that positive testimony that a sound was heard is not contradicted by negative testimony that the sound was not heard, since in the latter case the sound may have been made and simply not heard. The railroad company contends that testimony that the whistle was not blown, as here, should be given no greater weight than testimony that the whistle was not heard. For that reason the defendant contends that there is no direct contradiction and that its positive testimony that the whistle was blown establishes that fact, citing *Cavendish* v. *Chesapeake & O. R. Co.,* 95 W. Va. 490, Point 1, Syllabus, 121 S. E. 498, as approved in *Jones* v. *Virginian R. Co.,* 115 W. Va. 665, 177 S. E. 621. The *Cavendish* case states plainly that the circumstances of each particular case control the application of the rule and on page 675 of the opinion in the *Jones* case will be found the statement that in that case none of the plaintiff's witnesses at the time of the accident were giving particular attention to the signals and that none of them undertook to state unequivocally, as here, that the train signals were not given. The plaintiff below meets this contention by citing *Carnefix, Admr.* v. *Kanawha & M. R. Co.,* 73 W. Va. 534, 82 S. E. 219, the holding of which concedes the principle contended for by the plaintiff in error, but goes further by declaring that negative testimony as to the existence of a sound, as a matter of law may have

equal weight with positive testimony to the same effect, provided that "special circumstances" gave the witnesses who testified negatively a specific and definite reason for listening or being on the alert as to whether a sound existed at a specific time.

Two earlier West Virginia cases dealing with the same question are *Canterbury* v. *Director General of Railroads,* 87 W. Va. 233, 104 S. E. 597, and *Casdorph* v. *Hines,* 89 W. Va. 448, 109 S. E. 774, the latter case holding that the negative testimony of witnesses who were in a position to observe with unusual care the failure of the railroad company's agent to sound the whistle was entitled to peculiar weight. See also the annotation in 162 A. L. R. 9 at page 75 where the cases concerning auditory signals are annotated and at page 93 where the cases concerning witnesses in vehicles will be found. As stating the proposition that an issue of fact between witnesses who testify that the whistle was blown or the bell rung on the occasion in question and those in a position to observe who testify positively that it was not blown presents a question for the jury, see *Kelley* v. *Kanawha & M. R. Co.,* 99 W. Va. 568, 130 S. E. 677.

A number of the plaintiff's witnesses were confronted with what a jury could well regard as "special circumstances" that caused them to pay particular attention to whether the train actually whistled. Certainly the three who were on the front seat of the truck about to cross the track were in circumstances that required their attention. Mrs. Belcher's reason for listening attentively, as well as that of the witness Copen, both of whom testified that the whistle did not blow, could have placed them in the class of witnesses whose testimony as a matter of law was entitled to equal weight with the testimony of the defendant's witnesses. We are of the opinion that it was an issue of fact the decision of which rested with the jury and hence that there is no maintainable reason for setting the verdict aside because the evidence of the defendant railroad company clearly preponderates that of the plaintiff on the question of maintaining a lookout or of giving

the required signal for the Bream Crossing. The railroad company's instruction No. 13 was based upon the witnesses of the plaintiff having testified that they did not hear the signals. Their testimony was to the effect that the signals were not given. The instruction was properly declined.

The sixth contention of the railroad company is that it was the duty of Kirkhart to stop, look and listen effectively before crossing its track. This question we believe can be dealt with together with the seventh, eighth and ninth questions briefed and submitted, the last three having to do with visibility the morning of the accident, Kirkhart's negligence in failing to observe the train, and that Kirkhart's negligence was the sole proximate cause of the accident.

Of course it is to be borne in mind that the negligence of Kirkhart is not imputable to plaintiff's decedent. *Parsons v. New York Cent. R. Co.*, 127 W. Va. 619, 34 S. E. 2d 334; *McClaugherty, Adm'r.* v. *Tri-City Traction Co.*, 123 W. Va. 112, 116, 14 S. E. 2d 432; *Jones* v. *Virginian R. Co.*, 115 W. Va. 665, 177 S. E. 621; *Jameson* v. *Norfolk & W. R. Co.*, 97 W. Va. 119, 124 S. E. 491. . That being so we believe that our discussion concerning the duty of the railroad to maintain a lookout and to sound the required crossing signal disposes of the question as to whether the negligence of Kirkhart was the sole proximate cause of Tawney's death. Undoubtedly there was testimony enough to sustain a finding by the jury that Kirkhart was guilty of negligence. We believe there was also enough testimony to sustain a finding that the defendant railroad company had failed to perform its duties required by law and had not exercised the degree of care that it should, and that had it exercised proper care the accident would not have occurred and therefore its failure was a contributing cause.

As to the extent to which Kirkhart's negligence contributed to the injury and the extent to which that of the railroad company contributed, it is clear that that cannot be determined and is not a question before this Court.

Undoubtedly it was Kirkhart's duty to look and listen and if necessary to stop for that purpose. *Parsons* v. *New York Cent. R. Co.*, 127 W. Va. 619, 34 S. E. 2d 334; *Robertson* v. *Monongahela Power & R. Co.*, 99 W. Va. 356, 128 S. E. 829. There is some testimony that the fog was quite dense and that visibility was limited to less than forty feet. There is testimony to the contrary. The headlight of the locomotive was not lighted. Kirkhart's testimony is to the effect that the window of the cab of the truck facing the direction from which the train was coming was down four or five inches so that he or one of the men sitting with him could observe and Hensley testified that he could not see the train through the fog until it was within about twenty feet of the truck and that then he saw it through the open window. The baggage master testified that immediately after the wreck he saw the truck twenty or thirty feet from the track and that the right window was closed and beclouded with steam. It is not possible in a matter of this sort to discuss and compare in detail the many conflicting statements made by witnesses. We can say only that we have examined the record with care and have reached the conclusion that there is no showing as a matter of law that Kirkhart's negligence was the sole proximate cause of the death of plaintiff's decedent.

The tenth point briefed is that plaintiff's decedent was guilty of contributory negligence in not warning Kirkhart of the approach of the train under the rule laid down in *Gilkerson, Adm'r.* v. *Baltimore & O. R. Co.*, 129 W. Va. 649, 41 S. E. 2d 188; *Jones* v. *Virginian R. Co.*, 115 W. Va. 665, 177 S. E. 621; *Jameson* v. *Norfolk & W. R. Co.*, 97 W. Va. 119, 124 S. E. 491; *Waller* v. *Norfolk & W. R. Co.*, 108 W. Va. 576, 152 S. E. 13.

In *Jameson* v. *Norfolk & W. R. Co.*, 97 W. Va. 119, 124 S. E. 491, cited by counsel for the railroad company, the rule is limited to a passenger who "had full opportunity to see and hear the approaching train in time to warn the driver of the automobile." Plaintiff's decedent was one of fourteen passengers riding in the truck driven by Kirkhart. Two of these passengers sat on the seat with

the driver. Twelve of them, including plaintiff's decedent, rode on side seats in the body of the truck which was covered by a canvas tarpaulin supported by metal and fastened to the sides of the truck. This covering had no windows with the exception of a small isinglass opening at the front. The back of the truck was open. In order for plaintiff's decedent to see in the direction from which the train was coming it would have been necessary for him to unfasten and lift the right side of the cover, with eleven other men in the small body of a three-quarter ton truck, together with tools, paint, et cetera. It is quite apparent that plaintiff's decedent did not have full opportunity to see and hear the approaching train.

The eleventh point briefed is that the verdict against the railroad company is in conflict with the clear preponderance of the testimony. We believe that this has been disposed of on the points previously discussed.

The twelfth point is that the court erred in refusing, upon motion of the defendant railroad company, to call a panel of twenty-four jurors instead of the usual panel of twenty, in order to allow the defendant railroad company four peremptory challenges, instead of allowing the two defendants whose positions were conflicting and hostile only four challenges between them. The right to peremptory challenges is conferred by statute and undoubtedly it is reversible error to deny that right to a litigant entitled thereto. Code, 56-6-12; *State* v. *Pearis,* 35 W. Va. 320, 13 S. E. 1006; *State* v. *Baltimore & O. R. Co.,* 15 W. Va. 362, 391. Defendants whose interests are the same exercise the right in common. Under the clear weight of authority from other jurisdictions, where the interests of defendants are hostile upon motion and proper showing it is error to decline the statutory number of peremptory challenges to each defendant. Here there is no question concerning a proper motion made in due time. The motion, however, is not sustained as a matter of course, but requires a "showing" to support it. 136 A. L. R. 428. Here the court's attention was not directed to anything in support thereof nor was any showing made. The testimony at

the trial fully justifies the statement of counsel for the railroad company that the interests of Kirkhart and their client were conflicting and hostile. There was, however, no showing of that nature before the Circuit Court at the time of the motion nor was the motion accompanied by an offer of such a showing. In this instance an examination of the pleadings possibly would show hostility, but we do not believe the mere statement that conflicting interests exist, without more, required the judge to take the initiative in inspecting the pleadings. If the pleadings are depended upon as the required showing the movant should direct the attention of the court to the reasons for so regarding them. Otherwise it is not error to disregard them. We therefore are of the opinion that it was not reversible error for the trial court to overrule the railroad company's motion.

The refusal of the railroad company's instruction No. 18, which was a statement of the "stop, look and listen" rule, we believe was justified because the rule dealt with was sufficiently covered by other instructions.

Counsel for Kirkhart contended that because Kirkhart's employer, United Fuel Gas Company, was a subscriber in good standing to the Workmen's Compensation Fund that that fact protects him from liability for negligence committed while discharging his duties of his employment. The cases cited to sustain this theory with one exception are from other jurisdictions where either a constitutional or a statutory provision differing from ours and relieving a negligent coemployee from liability is in effect. However, in addition to cases from other jurisdictions counsel for Kirkhart cite *Hinkelman* v. *Wheeling Steel Corporation,* 114 W. Va. 269, 171 S. E. 538, holding that a company doctor by reason of his employer being a subscriber is protected by the compensation act from liability for malpractice that aggravated an injury of another of the company's employees contracted in the course of his employment. It would seem that the same reasons that apply to the holding that, in the absence of a constitutional or statutory provision to that effect, a coem-

ployee's negligence is not protected by the compensation act would apply in the *Hinkelman* case. There is no contract as between coemployees and they are subject to the provisions of the compensation act in their relationship with each other in no way. They pay nothing into the fund that entitles them to protection under its terms. We can perceive nothing in sound reasoning that would entitle a coemployee to gratuitous protection for his own misconduct. To hold that a coemployee is not liable for his own negligence would increase the hazard of employments and be contrary to public policy. We have been able to find nothing apart from an express constitutional or statutory provision such as exists in New York, Texas, Massachusetts and Virginia that would entitle him to an exemption from liability. The opinion in the *Hinkelman* case seems to be based upon an assumption that the act contains a provision to the effect that there shall be *no* liability for an injury occurring in the course of and resulting from the employment of a person employed by a subscriber to the fund, extending the meaning of the act to include not only the employer, but also coemployees. At no time has our compensation act contained that broad a provision. It protects only the employer from common law liability. Being of the opinion that the *Hinkelman* decision is unsound, it is hereby expressly overruled.

For the foregoing reasons the judgment of the Circuit Court of Roane County is affirmed.

*Affirmed.*

Fox, PRESIDENT, dissenting:

I dissent from the decision of the majority in this case for the reasons following: FIRST: I disagree on some aspects of the holding of the majority on the subject of the selection of the jury. The Court is in unity on the proposition that "Upon a showing by one defendant that its defense is materially hostile to that of a co-defendant the defendant making the showing is entitled to the number of peremptory challenges allowed by statute, from a panel increased by that number." Our difference is on

whether the motion made by counsel for the railroad company was sufficient to call for the application of that principle, and an increase of the panel, so that each of the defendants would have been permitted to exercise four peremptory challenges. The establishment of a proposition of law is, in itself, of no value. It is the application thereof that counts.

The record shows that "After all parties announced ready for trial, counsel for The Baltimore & Ohio Railroad Company stated to the Court that the interests of the defendants were antagonistic and moved the Court to call a panel of twenty-four jurors so that each defendant might have the right to strike four jurors, which motion was by plaintiff's counsel resisted, and the said motion was by the Court overruled, to which action of the Court counsel for the defendant, The Baltimore and Ohio Railroad Company, excepted." In the opinion it is held that such a motion requires some character of showing to support it, and with this I agree. It is also stated in that opinion that "* * * an examination of the pleadings possibly would show hostility," but this was followed by the statement: "* * * but we do not believe the mere statement that conflicting interests exist, without more, requires the judge to take the initiative in inspecting the pleadings." With this last statement I cannot agree. I think we should deal with the matter from a realistic standpoint, and I am disposed to believe that when the motion was made in this case, it amounted to calling to the attention of the court the contention that defendants occupied antagonistic positions, and, in my opinion, the trial court should have referred to the pleadings and, if nothing more was offered, made its decision on the motion on such pleadings. I do not agree that there was no showing made, because I think the pleadings in the case were a showing of whatever was contained therein, and that on their showing alone, the motion for a panel of twenty-four jurors should have been sustained. We have held that it was not error to do so. *Horchler* v. *Van Zandt,* 120 W. Va. 452, 199 S. E. 65. I do not think it was necessary

for counsel for one of the defendants to offer to show what the pleadings themselves contained. Of course, if the pleadings did not show the antagonistic positions of the defendants, then some additional showing would have to be made; but a reading of the opinion will disclose that there was a probability, and, as I believe, a certainty, that the pleadings themselves would have settled the question, had the court examined them. The record is not entirely clear whether the pleadings were examined: it only states that the motion of defendants was resisted by plaintiff's counsel, but I think it fair to assume that in a case of this importance, the Court had examined the pleadings at some stage of the litigation. No doubt there was at some time a discussion, which brought to the court's attention the declaration and pleas filed in the case. It was, in my opinion, error on the part of the trial court not to call for additional jurors, so that each of the defendants would have had four peremptory challenges.

SECOND: I do not subscribe to the second point of the syllabus which states: "In the absence of a joint enterprise, the negligence of the driver of a motor vehicle attempting to cross a public railroad crossing cannot be imputed to a passenger in the vehicle." This statement of law was first made in *Parsons* v. *New York Cent. R. Co.*, 127 W. Va. 619, 34 S. E. 2d 334; and is repeated here. I think it is too narrow a statement of the rule governing imputed negligence. I agree that where a joint enterprise exists, the negligence of one joint adventurer may be imputed to the other adventurers on the theory of agency; but I think there are many other situations where negligence can be imputed, and where there is no joint enterprise. I agree, also, that in the case of a guest passenger, or where neither the element of joint adventure, master and servant, nor principal and agent exists, negligence may not be imputed to the passenger. We so held in *Gilkerson* v. *B. & O. R. R. Co.*, 129 W. Va. 649, 41 S. E. 2d 188, and other cases therein cited sustain that view.

In 38 Am. Jur., 920, under the general head of "Imputed

Negligence," Sections 235 and 236, there is a general discussion of the subject from which I quote in part:

> "As a general rule, it may be said that in order to impute the negligence of one person to another, there must exist between them some relation of master or superior and servant or subordinate or other relation akin thereto. The relation between them must be one invoking the principles of agency, or the persons must be cooperating in a common or joint enterprise, or the relation between the parties must have been such that the person to whom the negligence is imputed must have had a legal right to control the action of the person actually negligent. As the rule is stated by the American Law Institute, the relation between the plaintiff and the third person must be such as to make the plaintiff responsible at common law for the negligent conduct of such third person. Conversely stated, negligence in the conduct of another will not be imputed to a party if he did not authorize such conduct, participate therein, or have the right or power to control it. * * *

> "It is fundamental that the act of an agent or servant is to be deemed the act of his principal or master. The law imputes to the latter responsibility for the negligent acts of his agent or servant so far, at least, as those acts are within the scope of the employee's authority or employment, and if those acts cause injury to third persons, the law holds the principal or master liable in damages therefor. * * *"

As applied to the present case, while I see no reason why the statement should be made, and certainly it is not a necessary point of decision, it can do no harm, because, clearly, the negligence of Kirkhart cannot be imputed to plaintiff's decedent; but it does make a statement of law which we will hereafter be compelled to explain away, because it ignores the whole theory of imputed negligence of a servant or agent to his employer or principal. Undoubtedly, the negligence of a servant or agent is imputed to the employer or his principal. The statement of law

contained in this syllabus point limits it to the case of a driver of a motor vehicle attempting to cross a public railway crossing, but I assume no one will contend that any special rule of law should be laid down governing passing over a railway crossing. The holding announced will, no doubt, hereafter be used to sustain the theory that only in case of a joint enterprise can the negligence of a driver be imputed to a passenger in an automobile, whether he be a guest passenger, or a principal or employer of the person who actually committed the act of negligence.

I did not participate in the *Parsons* case, and I am, therefore, free to criticize the statement of law made therein, and which is now copied into the case at bar. As stated above, the holding involved is not important in the case now under consideration, but I want to register my nonconcurrence therein, because I think it will give us trouble later on.

THIRD: I have come to the conclusion that it would be unwise to depart, in principle, from the rule laid down by this Court in *Hinkelman* v. *Steel Corporation,* 114 W. Va. 269, 171 S. E. 538. In that case a physician, employed in contract practice by an employer, was held relieved of liability for alleged malpractice in treating an employee of such employer, who was a subscriber to the Workmen's Compensation Fund, on the general theory that the workmen's compensation statute relieved not only the employer, but his agents and servants as well, from such liability. I question whether relief from legal liability should extend to a physician, who had nothing to do with the accident causing the injury, but whose connection with the case arose thereafter, but such is the holding in that case. However this may be, in my opinion, our Workmen's Compensation Laws were intended to, and do, relieve employers and their employees, whether in a supervisory capacity, or otherwise, from liability for damages resulting from injury to, or the death of any employee engaged in the same enterprise or employment,

where the employer is a contributor to the Workmen's Compensation Fund, and is in good standing with that fund.

Comparatively few instances will be found where an employer acts in a direct supervisory capacity toward his employees; but in such cases, if he is a contributor to the compensation fund, and in good standing, the injured employee, or, in case of death, his dependents, must look to the compensation fund for relief, and the employer is relieved of all liability. That was the general purpose of our Workmen's Compensation Law, which was supposedly enacted in the interest of employees.

In the great majority of instances, the employer conducts his business through agents and employees. Generally there are various grades of employees, such as managers, supervisors, bosses, and foremen, who direct the work of others. These men are the instrumentalities by which the employer functions. But for the Workmen's Compensation Laws, the employer would be liable for the negligence of his supervisory servants. The Compensation Law protects an employer against liability for his own negligence, and that of his agents and servants, and in lieu thereof requires him to contribute to a fund, out of which compensation is paid to injured employees, or, in case of death, to their dependents, whether the injuries or death result from the negligence of either the employer or his employees, or through occurrences in the course of employment unaccompanied by negligence, except in those cases where there has been wilful misconduct on the part of an employee, or disobedience of rules legally promulgated, or a self-inflicted injury. Code, 23-4-2.

This being true, I do not believe that the Legislature intended to leave to employees the right to sue other employees of the employer, whose payments into the compensation fund furnished, in part at least, the money used by the compensation department in compensating employees for injuries or death. In my opinion, the pay-

ment of compensation was intended to cover all damages resulting from a particular injury or death in the course of and resulting from employment, however or by whom caused among fellow-employees or employers, where protection is afforded by our Workmen's Compensation Law, except, of course, cases of intentional, wanton and malicious injury by a fellow-employee.

Admittedly, the Workmen's Compensation statute throws no light on the subject, but the general purpose of the original Workmen's Compensation Act, being benevolent in its purpose, and being intended to insure to injured employees, and their dependents in case of death, compensation for injuries sustained in industrial pursuits; and further intended to avoid the mass of litigation which had resulted from injuries in mines and factories, which was rapidly increasing, provided for compensation in all cases, whether resulting from negligence or otherwise, except only cases of wanton disobedience of rules, wilful misconduct, and self-inflicted injuries. This, I think, clearly shows that it was not the intention of the Legislature merely to relieve employers, and not relieve fellow-servants as well. It may be contended that, had the Legislature intended to make the payment of compensation operate to relieve the negligence of fellow-servants in acts causing injury to a fellow-employee, and for which compensation was paid by the employer, it could have so provided, and that the fact that it did not do so strongly argues that it was not so intended. This may be true. On the other hand, the Legislature, had it so intended, could have specifically provided that payment of compensation to an injured employee, should not be construed to prevent an injured person, or, in case of death, his personal representative, from maintaining an action against a negligent fellow-servant. In my opinion, these two arguments off-set each other, and leave us where we started and the question remains: What was the intent of the Legislature when it enacted, from time to time, what now constitutes our Workmen's Compensation Laws?

I do not believe that it was the intent of the Legislature thus to relieve employers from liability for injury or death arising out of the labors of their employees, and, in a practical sense, transfer the burden of that liability to such of their employees as might be connected, in a negligent way, in events leading up to the injury or death involved. Presumably, the compensation which has been provided for is reasonably adequate, and there would seem to be no reason why further payments should be assessed, in the way of damages, against employees of an employer, who through his own contributions to the compensation fund has provided fair compensation for·such injury or death. It occurs to me that double compensation for the same injury or loss of life was never contemplated by the Legislature.

That this is the proper interpretation of the legislative intent is manifest, when we consider the contemporaneous and continuing construction of the Workmen's Compensation Act, enacted by the Legislature at its 1915 session. For more than thirty years, the Act has been understood to relieve employees from liability for injuries sustained by those in the same employment, where the employer was a contributor to, and in good standing with, the Compensation Fund. This is attested by the fact that only once, in 1933, in the *Hinkelman* case was any contrary contention made; and in that case, what had been theretofore the construction given the Act, was upheld by the unanimous vote of this Court. Now it is all undone, and a "Pandora's box" opened, with consequences which no one can accurately gauge. Does anyone suppose that, had it been believed that the Act did not relieve employees, there would not have been numerous actions to recover damages, where injury or death had been the result of negligence on the part of fellow-employees; nor can anyone doubt that such actions, in great number, will be the result of the decision in this case.

The compensation paid to an injured workman, or, in case of his death, to his dependents, is rarely considered by him or them as adequate. Therefore, in all probability,

where the negligence of a fellow-workman can be shown, actions for damages will be instituted by injured workmen, or their personal representatives. Every superintendent, supervisor, boss, foreman, and I think every fellow-worker, will perform the work assigned to him, without any expectation of sharing in the profits of the enterprise in which he works, but loaded with his employer's former liability for acts resulting in injury to, or death of, a fellow-employee, in all cases where a jury can be convinced that there was any negligence on his part. In my opinion, no individual employee should be required to take that risk, where, as here, the State, under its police powers, and on broad grounds of public policy, has made fair provision for compensation for injuries or death in industry, regardless of whether the injury or death was or was not the result of negligence.

But, it may be argued, why should not a negligent employee be held liable for his wrong? Perhaps, he should be to the same extent as an employer were it not for the Workmen's Compensation statutes, which provide for compensation for all injuries. In my view, when an employer complies with the requirements of the compensation statute, and is thereby relieved of all liability for his own negligence, and all liability resulting from the negligence of his servants, it should operate to relieve his employees as well. In my opinion, the legislative intent was to make the payment of compensation cover all damages for a particular injury, whether that injury resulted in temporary disability to work, or in death. If, in contemplation of law, full compensation is paid, no further compensation in the way of damages can be justified. This proposition is answered by the statement that employees pay nothing into the Compensation Fund; but, presumably, the payments made by employers are adequate fairly to provide compensation to persons entitled thereto, and the matter of who makes the payments is, in my opinion, unimportant.

I have not referred to cases from other jurisdictions, and have only dealt with the question of the legislative

intent and the effect which should be given to the Act as written. The background of the Workmen's Compensation legislation, and the construction given thereto over a long period of time, convince me that it never was intended that injured persons or, in case of death, their dependents, having once received compensation, as in the case at bar, should be entitled to recover damages from their fellow-workers.

I would therefore reverse the judgment of the Circuit Court of Roane County against The Baltimore and Ohio Railroad Company, and award to it a new trial on the ground that it was denied the right to four jury challenges contended for by it; and remand the case to the Circuit Court of Roane County for that purpose; and I would reverse the judgment of said court against M. C. Kirkhart, set aside the verdict against him, and remand the case to the circuit court of said county, with direction to dismiss the action as against him.

I am authorized to state that Judge Haymond concurs with me in points FIRST AND SECOND of this dissent. He does not concur in the views expressed under point THREE hereof.

RILEY, JUDGE, concurring:

I concur in the majority opinion, including Syllabus 2 of the instant case, which is taken verbatim from Pt. 7, Syl., *Parsons* v. *The New York Central Railroad Co.* This syllabus reads: "In the absence of a joint enterprise, the negligence of the driver of a motor vehicle attempting to cross a public railroad crossing cannot be imputed to a passenger in the vehicle." While it is true, as suggested in the dissenting opinion filed by Judge Fox in the instant case, that the negligence of a servant or agent is imputed to the employer or his principal, the syllabus is confined to the mere relationship of the driver of a motor vehicle and a passenger. If the *Parsons* case involved the relationship of employer and servant or principal and agent, the negligence of the servant or agent would be

imputed to the employer or his principal; but the *Parsons* case, as shown by the syllabus in question, involved a mere passenger, in which event, in the absence of a joint enterprise, the negligence of the driver cannot be imputed to a passenger. There is no relationship beyond that involved in the instant case.

In my opinion, the correct rule is that "The negligence of the driver of an automobile cannot be imputed to a passenger, but the passenger must use such reasonable care for his own safety as an ordinarily prudent person would exercise under like circumstances." *Jameson* v. *Norfolk & Western Railway Co.*, 97 W. Va. 119, 124 S. E. 491. That statement does not deal with imputed negligence: it covers the primary negligence of the passenger himself.